**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

HOUSTON CASUALTY COMPANY,

Plaintiff,

v.

CIBUS US LLC,

Defendant.

And Related Counterclaim

Case No. 19-cv-00828-BAS-LL

**ORDER:**

**(1) DENYING HOUSTON CASUALTY COMPANY'S MOTION FOR SUMMARY OR PARTIAL SUMMARY JUDGMENT (ECF No. 34);**

**(2) GRANTING IN PART AND DENYING IN PART CIBUS US LLC'S MOTION FOR PARTIAL SUMMARY JUDGMENT (ECF No. 40); AND**

**(3) CLARIFYING ORDER ON MOTION TO BIFURCATE (ECF No. 33)**

This case is an insurance coverage dispute between Houston Casualty Company ("HCC") and Cibus US LLC ("Cibus"). Cibus is a company that develops seeds for crops, including hybrid canola plants. Cibus developed its canola hybrids to be tolerant of a specific herbicide. It then sold seeds to commercial growers. But after some of those

19cv0828

growers applied herbicide, their canola hybrids suffered more phytotoxicity—plant damage—than expected. Cibus turned to HCC, its insurer, to cover the growers' losses under an errors and omissions policy. HCC paid out the maximum of its policy with Cibus subject to the right to seek reimbursement. HCC then sued, seeking a determination that its policy did not cover the growers' crop injuries. Cibus countersued with breach of contract and bad faith claims.

Both HCC and Cibus now move for summary judgment or partial summary judgment. (ECF Nos. 34, 40.) The Court held oral argument on the motions, as well as HCC's Motion to Bifurcate (ECF No. 33). (ECF No. 81.) For the following reasons, the Court denies HCC's Motion for Summary or Partial Summary Judgment, grants in part and denies in part Cibus's Motion for Partial Summary Judgment, and clarifies the Court's Order on HCC's Motion to Bifurcate.

## BACKGROUND

## I.  Cibus's Canola Hybrids

"Cibus is a late-stage start-up company that provides environmentally-friendly seed development and selection services using proprietary breeding technology." (Broos Decl. ¶ 3, ECF No. 40-9.)[1] One of the company's goals "is to provide herbicide-tolerant, non-genetically modified organism ('non-GMO') canola seeds to its grower-customers." (*Id.*) To date, Cibus's first and only commercial products are its herbicide-tolerate canola hybrids. (*Id.*) Cibus developed these hybrids to be tolerant to sulfonylurea ("SU")

---

[1] Both parties lodge evidentiary objections in connection with the motions. (ECF Nos. 62-1, 71-1, 73-2.) Many of the objections, including those regarding relevance, foundation, or speculation, are subsumed within the summary judgment standard. *E.g.*, *Pauma Band of Luiseno Mission Indians of the Pauma & Yuima Rsrv. v. California*, 343 F. Supp. 3d 952, 974 n.3 (S.D. Cal. 2018). Further, the Court resolved several other objections by ruling on the parties' motions to exclude expert testimony.

As to the remaining objections, the Court overrules HCC's challenges to the declaration of Carlos Broos. HCC argues Cibus did not disclose this fact witness, but given the content of the declaration, any nondisclosure was harmless. Otherwise, to the extent that the Court relied on objected-to evidence for this Order, it relied only on evidence that "can[] be presented in a form that would be admissible in evidence" at trial; therefore, the rest of the objections are overruled. *See* Fed. R. Civ. P. 56(c)(2); *see also Capitol Records, LLC v. BlueBeat, Inc.*, 765 F. Supp. 2d 1198, 1200 n.1 (C.D. Cal. 2010).

herbicide.  (Joint Statement of Undisputed Facts ("JSUF") ¶ 13, ECF No. 72.)  Draft® is a brand name formulation of SU herbicides.  (*Id.* ¶ 14.)

### A.    2017 Crop Injury

In 2017, Cibus conducted a trial program of one of its canola hybrids (C5507) in Canada.  (JSUF ¶ 17.)  Cibus provided approximately 100 growers with free seeds to grow 40-acre plots of the C5507 hybrids.  (*Id.*)  After applying Draft, some of the growers reported higher than anticipated levels of plant damage—phytotoxicity—to their crops. (*Id.* ¶ 18.)

Cibus and its agricultural consultant, AgCall, investigated the growers' reports. (JSUF ¶ 19.)  In August 2017, Cibus placed its insurer at the time, Certain Underwriters at Lloyd's, London, on notice of the 2017 crop injury.  (HCC's MSJ Ex. R, at 216:14–217:16, 222:11–19; Ex. S.)  Cibus later decided not to proceed with an insurance claim.  (*Id.* Ex. R, at 222:11–19.)  It instead compensated the Canadian growers out-of-pocket with cash payments and seeds totaling CAD $196,774 and trips to San Diego worth approximately $100,000.  (*See id.* Ex. T.)

### B.    2018 Crop Injury

For the 2018 growing season, Cibus developed a "White Glove" service program to provide more specific instructions and hands-on customer support to try to avoid chemical application errors by growers to the canola hybrids.  (JSUF ¶ 20.)  Cibus also purchased an errors and omissions liability policy from HCC.  (*Id.* ¶ 1.)

In 2018, Cibus provided its C5507 canola hybrids for growers in the United States and Canada.  (JSUF ¶ 15.)  It also provided another hybrid seed variety (C5522) for growers in the United States.  (*Id.* ¶ 16.)  However, after applying Draft, some growers of the C5507 hybrids in Canada and the C5507 and C5522 hybrids in the United States reported higher than anticipated levels of damage to their crops.  (*Id.* ¶ 21.)

### C.    Cause and Foreseeability of the 2018 Crop Injury

HCC believes Cibus knew there were fundamental problems with the design of its canola hybrids when Cibus sought insurance for the 2018 season.  (HCC's MSJ 6.)  To

19cv0828

support this theory, the insurer explains that Cibus's canola hybrids gain their resistance to SU herbicide through specific gene mutations—the "SU Tolerance Gene." (*Id.* Ex. B, at 32:8–22.) Cibus first produced canola varieties that had two copies of the SU Tolerance Gene—seed lines C5507 and C5522. (*Id.* 32:23–33:13.) These varieties are "duo" hybrids because they have two copies of the SU Tolerance gene. (*See id.* 32:18–36:20.)

Before 2015, Cibus began researching "quattro" canola hybrid varieties that have four copies of the SU Tolerance Gene. (HCC's MSJ Ex. B, at 119:23–121:11; Ex. C, at 114:22–24, 117:13–118:6.) Quattro varieties demonstrate greater tolerance to SU herbicide and a reduced risk of plant damage when compared with duo varieties. (*Id.* Ex. C, at 133:21–24, 150:23–151:5, 152:12–153:22.) These improved varieties were in commercial development by 2017 and rolled out by 2019. (*Id.* Ex. B, at 121:9–11; 188:25–196:19.)

HCC highlights several communications between Cibus employees suggesting the company knew its duo hybrids would encounter problems in 2018. In July 2017, Cibus's Associate Director of Product Development wrote that the company "will have to manage the message around, if not temper expectations in 2018." (HCC's MSJ Ex. M.) He continued:

> The technical risk will go down a great deal once the [SU Tolerance Gene] is in both sides of the pedigree, but we need to be able to provide technical agronomy support on the ground in Canada with our sales staff to be successful. Finally, to plug the breeding and genetics side of things, the future will be VERY bright for SU canola in 2019 and beyond!

(*Id.*) Similarly, in October 2017, a Cibus employee stated the company "has new hybrids under [ ] development that will increase our herbicide tolerance to SU chemistries with 4 copies of the SU tolerant gene in the plant which will add additional crop protection, but these new lines (Quattro Hybrids) are [a] couple of years away from commercial sales." (*Id.* Ex. O.)

Cibus paints a different picture. Relying on a declaration from Dr. James A. Radtke, Cibus's Senior Vice President of Product Development, Cibus stresses that each year, the

19cv0828

company produces new seed lots, primarily at contra-season growing facilities in Chile, to be sold in the upcoming growing season. (Radtke Decl. ¶ 4, ECF No. 40-11.) So, the seeds used in the 2018 growing season were not grown until the winter of 2017–18, after which they were harvested and transported to the United States for use in the 2018 canola growing season in North America. (*Id.* ¶ 5.)

Further, Cibus explains that it believes the 2017 crop issues were traced to how the Canadian growers applied herbicide to their crops. (Radtke Decl. ¶ 11.) Cibus believes cultural differences in the way herbicides and their associated adjuvants are packaged and sold in Canada led to growers applying the chemicals to their crops in a manner that led to excessive damage. (*Id.*) Hence, Cibus created the "White Glove" customer program mentioned above to prevent this from occurring the following year. (*Id.* ¶ 12.)

In comparison, for 2018, Dr. Radtke is not aware of "any indication that the crop issues those growers suffered were the result of chemical misapplication." (Radtke Decl. ¶ 13.) Rather, after an investigation, Dr. Radtke determined the 2018 growers' issues were the result of genotype-environment reactions ("GxE") "that resulted from the growing environment in 2018." (*Id.* ¶ 15.) "These growing conditions had not previously been encountered by Cibus canola, meaning that the GxE interactions that occurred in 2018 were not observed in the several prior years of testing and commercial use of Cibus canola hybrids." (*Id.*) And, at least from Dr. Radtke's perspective, the company was surprised when these interactions occurred in 2018 and caused some of its customers "to suffer poorer harvests than they otherwise would have." (*Id.*)

## II. The Policy

### A. Terms

As mentioned, Cibus purchased insurance from HCC before the 2018 growing season. HCC issued Professional Liability Errors & Omissions Insurance Policy No. H717-110623 ("Policy") to Cibus for the November 1, 2017, to November 1, 2018, Policy Period. (JSUF ¶ 1.) The Policy has a $2 million limit. (*Id.*) Its Insuring Agreement, Section 1.A, provides:

19cv0828

> [HCC] shall pay Loss and Claim Expenses . . . that an Insured shall become legally obligated to pay as a result of a Claim made against an Insured for a Wrongful Act arising from Professional Services provided always that: (1) the Claim is first made against an Insured during the Policy Period . . . ; (2) an Insured's partners, principals, officers, directors, members or risk managers had no knowledge of any circumstances, dispute, situation or incident that could reasonably have been expected to give rise to such Claim prior to the Knowledge Date stated in the Declarations of this Policy; and (3) the Wrongful Act takes place on or after the Retroactive Date . . . and prior to the end of the Policy Period.

(*Id.* ¶ 2; Policy § I.(A), HCC's MSJ Ex. A.)[2]  A "Claim" is "a written demand made against any Insured for monetary damages or non-monetary relief[.]"  (Policy § IV.(C).)  Further, a "Wrongful Act" is "any actual or alleged negligent act, error or omission committed or allegedly committed by any Insured solely in connection with the rendering of Professional Services."  (*Id.* § IV.(CC).)  The Policy defines "Professional Services" as "services as a Seedsmen, for others for a fee. [sic] performed for others, by or on behalf of an Insured, for a fee or pro bono."[3]  (*Id.* Endorsement No. 1.)

## B.  Claim and Payment

Cibus notified HCC of the 2018 growers' reports of higher than anticipated crop damage ("2018 Canola Claim").  (JSUF ¶ 22.)  In October 2018, HCC agreed to defend Cibus in connection with the 2018 Canola Claim, subject to a full reservation of rights.  (*Id.* ¶ 23.)  HCC later agreed to pay the $2 million limit of the Policy, subject to the right to seek reimbursement.  (*Id.* ¶ 24.)  HCC tendered $1,973,000 of the Policy toward settling the 2018 Canola Claim, with the remaining $27,000 paid for defense and investigation costs over the $20,000 deductible.  (*Id.* ¶¶ 26–27.)  Hence, the settlement and defense costs payments exhausted the Policy's $2 million limit.  (*Id.* ¶ 28.)

---

[2] Capitalized terms that are not defined in this Order have the meanings given to them in the Policy.  Further, the Policy uses boldface type for all defined terms, but the Court omits this emphasis when quoting the Policy.

[3] In its briefing, Cibus characterizes the Policy as a "Seedsmen's E&O Policy."  (*E.g.*, Cibus's Opp'n 22.)  But aside from the definition of "Professional Services," the Policy does not appear to be tailored to the seedsmen industry.  So, although more specialized seedsmen E&O policies may exist, that is not the type of policy language before the Court.

## III.   Procedural History

In May 2019, HCC filed this diversity action against Cibus.  (Compl., ECF No. 1.)  In Counts I through VI, HCC seeks determinations that coverage is precluded or limited under the Policy for the 2018 Canola Claim.  (*Id.* ¶¶ 22–61.)  In the final claim, Count VII, HCC seeks recoupment of the $2 million it paid for defending and settling the 2018 Canola Claim.  (*Id.* ¶¶ 62–67.)

Cibus answered the Complaint and filed a Counterclaim.  (Answer & Countercl., ECF No. 10.)  In Counterclaim I, Cibus seeks a declaration of coverage in its favor.  (*Id.* ¶¶ 34–38.)  Counterclaim II raises a breach of contract claim stemming from HCC's alleged delay in responding to the 2018 Canola Claim.  (*Id.* ¶¶ 39–49.)  Finally, Counterclaim III alleges HCC breached the covenant of good faith and fair dealing in handling the 2018 Canola Claim.  (*Id.* ¶¶ 50–55.)  After hearing oral argument, the Court resolves the parties' cross-motions for summary or partial summary judgment.  (ECF Nos. 34, 40, 81.)

## LEGAL STANDARD

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought."  Fed. R. Civ. P. 56(a).  Summary judgment is appropriate under Rule 56(c) where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.  *See id.* 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A fact is material when, under the governing substantive law, it could affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.* at 248.

When cross-motions for summary judgment are filed by the parties, as here, "[e]ach motion must be considered on its own merits."  *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001).  In other words, a court must review the evidence submitted in support of each cross-motion, *id.*, and "giv[e] the nonmoving party in each instance the benefit of all reasonable inferences," *A.C.L.U. of Nevada v. City*

- 7 -

1    *of Las Vegas*, 466 F.3d 784, 791 (9th Cir. 2006).  Further, even where neither party disputes
2    issues of material fact, the court is still required to analyze the record to determine whether
3    disputed issues of material fact are present.  *United States v. Fred A. Arnold, Inc.*, 573 F.2d
4    605, 606 (9th Cir. 1978); *see also Chevron USA, Inc. v. Cayetano*, 224 F.3d 1030, 1037
5    n.5 (9th Cir. 2000) ("[T]he district court is responsible for determining whether the
6    requirements of [Rule 56] are met, whether or not the parties believe that they are.").

## ANALYSIS

8    The parties' motions ask the Court to interpret various provisions of the Policy to
9    determine whether summary adjudication is appropriate.  The cross-motions overlap for
10    some, but not all, of the issues raised.  Hence, the Court first reviews California insurance
11    law and then addresses the parties' motions by issue.

### I.    California Insurance Law

13    The parties recognize California law controls the Policy.  "Interpretation of an
14    insurance policy is a question of law and follows the general rules of contract
15    interpretation." *St. Mary & St. John Coptic Orthodox Church v. SBC Ins. Servs., Inc.*, 57
16    Cal. App. 5th 817, 825 (2020); *see also Bank of the W. v. Superior Ct.*, 2 Cal. 4th 1254,
17    1264 (1992) ("While insurance contracts have special features, they are still contracts to
18    which the ordinary rules of contractual interpretation apply.").

19    In interpreting an insurance policy, the court will "infer the parties' intent, if
20    possible, solely from the written provisions of the contract." *Doyle v. Fireman's Fund Ins.*
21    *Co.*, 21 Cal. App. 5th 33, 37 (2018) (citing Cal. Civ. Code § 1639).  "The 'clear and
22    explicit' meaning of these provisions, interpreted in their 'ordinary and popular sense,'
23    unless 'used by the parties in a technical sense or a special meaning is given to them by
24    usage,' controls judicial interpretation." *Hovannisian v. First Am. Title Ins. Co.*, 14 Cal.
25    App. 5th 420, 430 (2017) (citation omitted) (quoting *Ameron Int'l Corp. v. Ins. Co. of Pa.*,
26    50 Cal. 4th 1370, 1378 (2010)).

27    The court "must also 'interpret the language in context, with regard to its intended
28    function in the policy.'" *McMillin Mgmt. Servs., L.P. v. Fin. Pac. Ins. Co.*, 17 Cal. App.

5th 187, 201 (2017) (quoting *Hartford Cas. Ins. Co. v. Swift Distrib., Inc.*, 59 Cal. 4th 277, 288 (2014)). "Significantly, the provisions of an endorsement prevail over conflicting provisions in the body of the policy, if the relevant language of the endorsement is conspicuous and free from ambiguity." *Haynes v. Farmers Ins. Exch.*, 32 Cal. 4th 1198, 1217 (2004). "Coverage clauses are interpreted broadly in favor of the insured, and exclusionary clauses and limitations on coverage are interpreted narrowly against the insurer." *St. Mary*, 57 Cal. App. 5th at 825.

"A policy provision will be considered ambiguous when it is capable of two or more constructions, both of which are reasonable." *Waller v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, 18 (1995). If there is an ambiguity in the policy, the court "must first attempt to determine whether coverage is consistent with the insured's objectively reasonable expectations." *Bank of the W.*, 2 Cal. 4th at 1265. The insured's objectively reasonable expectations may restrict rather than expand coverage—the insured cannot claim coverage where a reasonable person would not expect it. *Old Republic Ins. Co. v. Superior Ct.*, 66 Cal. 4th 128, 144 (1998), *disapproved on other grounds by Vandenberg v. Superior Ct.*, 21 Cal. 4th 815, 841 n.13 (1999). The reasonable expectations inquiry "requires a consideration of the policy as a whole, the circumstances of the case in which the claim arises and 'common sense.'" *St. Paul Fire & Marine Ins. Co. v. Am. Dynasty Surplus Lines Ins. Co.*, 101 Cal. App. 4th 1038, 1058 (2002) (quoting *Bank of the W.*, 2 Cal. 4th at 1265).

Finally, if these rules do not resolve the issue, the last step is for the court to construe the policy's ambiguity against the insurer. *E.g.*, *St. Paul Fire*, 101 Cal. App. 4th at 1058. That said, if coverage turns on disputed issues of material fact, summary judgment is not appropriate. *See, e.g.*, *Guastello v. AIG Specialty Ins. Co.*, 61 Cal. App. 5th 97, 100, 106 (2021) (determining when an "occurrence' took place under policy was a disputed question of fact); *see also Vann v. Travelers Cos.*, 39 Cal. App. 4th 1610, 1618 (1995) (holding factual disputes concerning contamination of property precluded coverage determination in insurer's favor).

1

## II.   Claim Before Policy Period (Count I)

2

HCC's Count I seeks a declaration that there is no coverage for the 2018 Canola

3   Claim because the claim was made before coverage started.  (Compl. ¶¶ 22–29.)  The

4   Policy is a "claims made" errors and omissions policy.  Thus, the Policy requires that a

5   Claim be made first during the November 1, 2017, to November 1, 2018, Policy Period.

6   (Policy §§ I.(A), IV.(S), Declarations.)  *See, e.g.*, *Homestead Ins. Co. v. Am. Empire*

7   *Surplus Lines Ins. Co.*, 44 Cal. App. 4th 1297, 1300 (1996) ("[A] 'claims made' policy

8   limits coverage to claims made against the insured during the policy period.").

9

Of course, the 2018 Canola Claim was made after the Policy Period started on

10   November 1, 2017.  HCC, however, argues that other sections of the Policy deem the 2018

11   Canola Claim to have been "made" before the Policy Period.  (HCC's MSJ 15–17.)  To

12   explain, as mentioned above, the Policy covers a Claim against the Insured for a Wrongful

13   Act arising from Professional Services, which are "services as a Seedsmen, for others for

14   a fee."  (Policy § I.(A), Endorsement No. 1.)  Another provision, captioned "Multiple

15   Claims," states that "[t]wo or more Claims based upon or arising out of the same Wrongful

16   Act or Interrelated Wrongful Acts shall be considered a single Claim[.]"  (*Id.* § VII.(E).)

17   Interrelated Wrongful Acts are "all Wrongful Acts that have as a common nexus any fact,

18   circumstance, situation, event, transaction, cause or series of causally connected facts,

19   circumstances, situations, events, transactions or causes."  (*Id.* § IV.(J).)

20

HCC argues the 2018 Canola Claim indisputably arose out of the same Wrongful

21   Act or Interrelated Wrongful Acts—Cibus's purported negligent design of its duo hybrid

22   seed varieties—that led to the 2017 crop injury.  (HCC's MSJ 15–17.)  Meaning, if true,

23   the Policy's Multiple Claims provision deems the 2018 Canola Claim "to have been made

24   when the first such Claim was made against" Cibus concerning the 2017 crop injury.  (*See*

25   Policy § VII.(E).)  And HCC would be entitled to summary judgment because the 2018

26   Canola Claim was not first made during the Policy Period.  (*See id.* §§ I.(A), IV.(S),

27   Declarations.)

28

In opposing HCC's motion and filing its own motion for summary adjudication, Cibus contends the insurer's "argument fails at the gate on a technical matter because HCC cannot show that a 'Claim' was ever brought against Cibus before the Policy Period began." (Cibus's MSJ 10.)  Cibus is correct.  This argument may be a "technical" one, but the Policy unambiguously supports Cibus's position.  *See Doyle*, 21 Cal. App. 5th at 37 (providing the court will infer the parties' intent "solely from the written provisions of the contract" when possible).

The Policy defines a "Claim" as "a written demand made against any Insured for monetary damages or nonmonetary relief" or "any civil or arbitration proceeding commenced by the service of a complaint or similar pleading and initiated against any Insured."  (Policy § IV.(A).)  Although Cibus notified its prior insurer—Lloyd's of London—about the 2017 crop injury, Cibus did not proceed with an insurance claim.  No lawsuit or proceeding was filed, and Cibus informally resolved the situation with the growers out-of-pocket.  *See supra* Background Part I.A.  Further, HCC does not cite to any written demand for money or nonmonetary relief made against Cibus arising from the 2017 crop injury that meets the Policy's "Claim" definition.  The insurer argues a claim was "undoubtedly" made against Cibus for the 2017 crop injury, but that argument is insufficient to survive summary adjudication.  (HCC's Reply 3.)  *See* Fed. R. Civ. 56(c)(1)(A) (requiring a party to cite "to particular parts of materials in the record" to support its factual positions on summary judgment).  By comparison, in 2018, the affected growers completed written claim forms against Cibus, which meet the Policy's "Claim" definition.  (Cibus's MSJ Ex. F.)

Because HCC has not shown an earlier "Claim" was made against Cibus, the Multiple Claims provision does not apply.  (Policy § VII.(E).)  There is no need to reach the parties' other arguments on Count I because the text of the Policy is unambiguous.  The Court thus grants Cibus's motion for summary adjudication of Count I and denies HCC's cross-motion on this claim.

19cv0828

### III.   Prior Knowledge of Circumstances (Count II)

Cibus, but not HCC, moves for summary adjudication of Count II in Cibus's favor. (Cibus's MSJ 15–19.)  Count II seeks a declaration of no coverage because Cibus had prior knowledge of the circumstances giving rise to the 2018 Canola Claim.  (Compl. ¶¶ 30–36.) The Policy's Insuring Agreement says there is only coverage so long as "an Insured's partners, principals, officers, directors, members or risk managers had no knowledge of any circumstances, dispute, situation or incident that could reasonably have been expected to give rise to such Claim prior to the Knowledge Date stated in the Declarations of this Policy" ("Prior Knowledge Clause").  (Policy § I.(A).)  The Knowledge Date is November 1, 2017.  (*Id.* Declarations.)

Cibus argues HCC cannot prevail on Count II for two reasons.  (Cibus's MSJ 15– 19.)   First, Cibus argues Count II relies on an improper and impermissibly broad interpretation of the Policy's Prior Knowledge Clause.  (*Id.* 16–18.)  Second, Cibus argues HCC cannot prove prior knowledge.  (*Id.* 18–19.)  HCC counters that disputed issues of material fact preclude summary adjudication of Count II.  (HCC's Opp'n 17–19.)

Like here, some professional liability policies "eliminate coverage if the insured had knowledge or notice of the act or omission giving rise to liability before the inception date of the policy."  Hon. H. Walter Croskey et al., California Practice Guide: Insurance Litigation Ch. 7K-B, § 7:2416 (The Rutter Group 2021).   To illustrate, in the legal malpractice context, an attorney executed a mechanics lien for his client.  *Phoenix Ins. Co. v. Sukut Constr. Co.*, 136 Cal. App. 3d 673, 675 (1982).  The client later notified the attorney that the lien might be defective and asked the attorney to correct the problem.  *Id.* When the client eventually sued the attorney for malpractice, the question was whether the attorney's professional liability policy covered the claim.  *Id.* at 676.

The attorney's policy required that the insured "at the effective date of the insurance did not know or could not have reasonably foreseen that such acts or omissions might be expected to be the basis of a claim or suit."  *Phoenix Ins.*, 136 Cal. App. 3d at 676.  The California Court of Appeal held this language was not ambiguous, and it affirmed the trial

court's finding that the policy did not cover the malpractice lawsuit.  *Id.*  The appellate court reasoned the attorney knew his client held him responsible for the defective lien before the policy started—making the claim excluded from coverage under the knowledge provision.  *Id.* at 677; *see also Am. Int'l Specialty Lines Ins. Co. v. Cont'l Cas. Ins. Co.*, 142 Cal. App. 4th 1342, 1357 (2006) (affirming determination that the insured "was aware of an actual or alleged fact, circumstance, situation, error or omission which could reasonably be expected to result in a claim being made against" the insured in light of a cease-and-desist letter and correspondence from the insured's insurance broker indicating knowledge before the policy incepted).

The Court finds the Policy's Prior Knowledge Clause is not ambiguous or impermissibly broad.  It is conspicuous, plain, and clear.  But what is not clear here is whether Cibus indisputably "had no knowledge of any circumstances, dispute, situation or incident that could reasonably have been expected to give rise to" the 2018 Canola Claim before the Knowledge Date.  (*See* Policy § I.(A).)  Viewing the evidence summarized above in the light most favorable to HCC, a factfinder could conclude Cibus knew there were problems with its duo canola hybrids before the Knowledge Date.  *See supra* Background Part I.C.  A factfinder could also conclude that producing seeds using proprietary breeding technology for the 2018 growing season with the same genetic structure as those seeds that encountered problems in 2017 could reasonably be expected to result in the 2018 Canola Claim.  Hence, the Court is unmoved by Cibus's argument that it is "simply impossible that Cibus" could have known of circumstances giving rise to the 2018 Canola Claim "because the seedsmen's services (including the production and selection of the seed itself) that are the subject of the [2018 Canola Claim] had not yet even been provided."  (Cibus's MSJ 16.)

In short, because there are genuine issues of material fact concerning Cibus's knowledge for the Policy's Prior Knowledge Clause, the Court denies Cibus's request for summary adjudication of Count II.

**IV.    Wrongful Act Before Retroactive Date (Count VI)**

The Court next addresses Count VI because it is analogous to Count II.  This claim seeks a declaration that there is no coverage for the 2018 Canola Claim because the Wrongful Act occurred before the Policy's Retroactive Date.  (Compl. ¶¶ 54–61.)  For coverage, the Policy requires that the Wrongful Act leading to the Claim occur on or after the Retroactive Date, which is November 1, 2016.  (Policy § I.A; Endorsement No. 8.)

HCC moves for summary judgment in its favor, arguing the wrongful conduct—the purportedly negligent design of Cibus's canola hybrids—indisputably occurred in 2015 before the Policy's Retroactive Date.  (HCC's MSJ 17–18.)  Cibus similarly seeks summary adjudication of this claim, arguing HCC's interpretation renders the Policy illusory for Cibus and improperly writes a "seed line exclusion" into the Policy.  (Cibus's MSJ 20–21.)

Like above, the Court is unmoved by Cibus's argument that HCC's interpretation is improper or renders the promised coverage illusory.  As HCC argues, "any number of possible claims could have arisen with respect to the canola hybrids that are not based on lack of herbicide tolerance due to genetic structure (*e.g.*, selling the wrong types of seeds, improper seed coating, or making recommendations for other products that harmed the crops)." (HCC's Opp'n 14.)  *Cf. Union Warehouse & Supply Co. v. Ill. R.B. Jones, Inc.*, 917 P.2d 1300 (1996) (claim arising from sale of seeds contaminated with goatgrass seed, a noxious weed); *Ranger Ins. Co. v. Globe Seed & Feed Co.*, 125 Or. App. 321 (1993) (claim that seed mixture sold for erosion control produced an infestation of yellowstar thistle, another noxious weed); *Econ. Mills of Elwell, Inc. v. Motorists Mut. Ins. Co.*, 8 Mich. App. 451 (1967) (claim arising from sale of cranberry seed beans that were "not suitable to the growing season in Michigan, and as a result, even though properly planted and cared for did not flower, pod and mature"). So, the fact that the Policy may not cover the 2018 Canola Claim does not render the coverage illusory.  *See Jeff Tracy, Inc. v. U.S. Specialty Ins. Co.*, 636 F. Supp. 2d 995, 1007 (C.D. Cal. 2009) ("Insurance coverage is

deemed illusory when the insured 'receives no benefit' under the policy." (quoting *Md. Cas. Co. v. Reeder,* 221 Cal. App. 3d 961, 978 (1990))).

Moving past Cibus's legal arguments, disputed issues of material fact concerning the cause of the 2018 Canola Claim preclude summary adjudication in either party's favor. Viewing the evidence in the light most favorable to Cibus, a factfinder could conclude the "Wrongful Act" did not occur until Cibus grew and selected seeds for growers in the 2018 season that resulted in crop yield losses. Conversely, a factfinder could adopt HCC's characterization of the evidence and conclude earlier design decisions doomed Cibus's seedsman services for the 2018 growing season and led to the 2018 Canola Claim. Both conclusions require reasonable inferences to be drawn in either HCC's or Cibus's favor. Consequently, the Court denies both parties' requests for summary adjudication of Count VI.

## V.   Insurance Requirement Endorsement (Count III)

HCC's Count III seeks a determination that coverage is excluded under the Policy's Warranty of General Liability Insurance Requirement Endorsement ("Insurance Requirement Endorsement"). (Compl. ¶¶ 37–47.) The Policy's Endorsement No. 6 provides:

> In consideration of the premium charged, it is hereby understood and agreed that, as a condition precedent to all coverage under this Policy, each Insured warrants that it has obtained, and will maintain . . . GL Insurance coverage, with aggregate limits of liability of not less than USD1,000,000 and upon request of [HCC], shall present evidence of such. Failure to obtain and maintain such GL Insurance coverage shall result in the voiding of all coverage under this Policy.

The Policy does not define "GL Insurance." (*See* Policy Endorsement No. 6, § IV.)

Cibus moves for summary adjudication of this claim, arguing the company indisputably satisfied the Insurance Requirement Endorsement. Cibus points to a general liability policy it obtained from Chubb for a policy period of November 1, 2017, to November 1, 2018 ("Chubb Policy"). (Chubb Policy, Broos Decl. ¶ 7, Ex. B.) HCC responds that the Chubb Policy did not satisfy the Insurance Requirement Endorsement

because it removed "products-completed operations coverage, which is a standard coverage provided under a general liability policy." (HCC's Opp'n 10.)

Upon review, the Chubb Policy is a general liability policy with a $2 million aggregate limit. (Chubb Policy, at CIBUS050358.) It provides $1 million for each occurrence for premises/operations claims, $1 million for advertising injury and personal injury claims, $1 million for rented premises claims, and $1 million for employee benefit errors and omissions. (*Id.*) The Chubb Policy states its premises/operations coverage does not apply to claims included in the "products-completed operations hazard." (*Id.* at CIBUS050388.) The products-completed operations hazard in turn applies to "all bodily injury and property damage taking place away from premises owned or occupied by . . . you and arising out of your product or your work." (*Id.* at CIBUS050435; *see also id.* at CIBUS050437 (defining "your work" and "your product").) The Chubb Policy's exclusion for the risk of completed products is not unusual:

> The modern [commercial general liability ('CGL' or 'CL')] policy provides basic 'premises and operations' coverage. This coverage insures for damages arising out of an occurrence at the insured's place of business as a result of the insured's ongoing business activities. The risk covered by the CGL premises and operations coverage differs from the risk posed once an insured relinquishes its products to third parties or completes its work. This latter risk is insured, for an additional hefty premium, under the products-completed operations hazard coverage. The purpose of the products-completed operations hazard coverage is to insure against the risk that the product or work, if defective, may cause bodily injury or damage to property of others after it leaves the insured's hands.

*Baker v. Nat'l Interstate Ins. Co.*, 180 Cal. App. 4th 1319, 1337 (2009). "Because of the 'hefty premiums' charged for 'products-completed operations hazard' coverage, among other reasons, it is often excluded." Hon. Croskey et al., *supra*, at § 7:2362; *see Baker*, 180 Cal. App. 4th at 1322 (noting the exclusion "has now become standard in the insurance industry nationwide"); *see also, e.g.*, *Castellet, Inc. v. Liberty Mut. Ins. Co.*, 810 F. App'x 548, 550 (9th Cir. 2020) (interpreting policy with "products-completed operations hazard"

exclusion); *United Specialty Ins. Co. v. E-Cig Vapor Emporium, LLC*, No. EDCV 18-0002 JGB (SHKx), 2018 WL 5098859, at *2 (C.D. Cal. Oct. 15, 2018) (same).

It is indisputable that Cibus procured and maintained a CGL policy "with aggregate limits of liability of not less than USD1,000,000." (Policy Endorsement No. 6.) If HCC, however, wanted to require Cibus to maintain CGL insurance with products-completed operations coverage, the insurer did not phrase the Insurance Requirement Endorsement in clear and unmistakable language. The endorsement mentions "GL Insurance" but does not define this term. The endorsement easily could have done so or mentioned products-completed operations coverage. "Because the insurer writes the policy, it is held 'responsible' for ambiguous policy language, which is therefore construed in favor of coverage." *AIU Ins. Co. v. Superior Ct.*, 51 Cal. 3d 807, 822 (1990). Consequently, the Court construes the Insurance Requirement Endorsement in favor of coverage and concludes summary adjudication of Count III against HCC and in favor of Cibus is appropriate.

## VI. Breach of Warranty Exclusion (Count IV)

HCC's Count IV seeks a determination that the Policy's exclusion regarding a breach of warranty ("Breach of Warranty Exclusion") precludes coverage for the 2018 Canola Claim. (Compl. ¶¶ 43–47.) The Breach of Warranty Exclusion states there is no coverage for "any Claim . . . based upon or arising out of breach of any warranty or guaranty made by any Insured unless such liability would have attached to that Insured even in the absence of such warranty or guaranty." (Policy § V.(K).)

"California courts have consistently given a broad interpretation to the terms 'arising out of' or 'arising from' in various kinds of insurance provisions." *Acceptance Ins. Co. v. Syufy Enters.*, 69 Cal. App. 4th 321, 328 (1999) (collecting cases). "[I]t broadly links a factual situation with the event creating liability, and connotes only a minimal causal connection or incidental relationship." *Id.* That said, the phrase here appears in an exclusion to coverage, and "exclusionary clauses are interpreted narrowly against the insurer." *See State Farm Mut. Auto. Ins. Co. v. Partridge*, 10 Cal. 3d 94, 102 (1973)

(reasoning "the fact that an accident has been found to 'arise out of the use' of a vehicle for purposes of an automobile policy is not necessarily determinative of the question of whether that same accident falls within a similarly worded exclusionary clause of a homeowner's policy"); *see also* Hon. Croskey et al., *supra*, at § 4:120.5.

HCC, but not Cibus, moves for summary adjudication of Count IV in its favor. HCC argues the Breach of Warranty Exclusion applies because Cibus's canola hybrids were "specifically designed to tolerate Draft herbicide," "were marketed and promoted to farmers to be used only with Draft herbicide," and Cibus "represented that using Draft would control weeds and increase profitability." (HCC's MSJ 19.) Cibus argues this exclusion must be construed narrowly and does not apply where Cibus also faced liability on theories other than breach of warranty, including professional negligence. (Cibus's Opp'n 18–23.) Cibus also argues it expressly disclaimed any warranties. (*Id.* 22–23.)

This case is not one where the Court can examine an underlying lawsuit or judgment to determine whether the 2018 Canola Claim arose from a breach of warranty. *Cf. Those Certain Underwriters at Lloyd's, London v. DVO, Inc.*, 473 F. Supp. 3d 236, 257–61 (W.D.N.Y. 2020) (interpreting—in the duty to defend context—an analogous warranty exclusion under New York law by examining the factual allegations of the underlying lawsuit, which included allegations that the insured breached an express warranty). As mentioned, the growers who encountered problems with their crops in 2018 completed written claim forms. The forms state:

> I the undersign[ed] wish to engage in the process of a formal claim for monetary compensation regarding the non-performance of my Cibus canola in the growing season of 2018. I believe that there will be substantial yield loss resulting in reduced per / acre return and significant loss of revenue per acre[.]

(Cibus's Opp'n Ex. G.) There is no mention of "any warranty or guaranty made by" Cibus in the growers' claim forms. (*See id.*) And viewing the evidence in the light most favorable to Cibus, the 2018 Canola Claim could have arisen from other conduct, including negligence or breach of contract. Therefore, the Court cannot conclude that the Breach of

Warranty Exclusion applies in these circumstances as a matter of law.  Consequently, the Court denies HCC's request for summary judgment on Count IV.

## VII.   Property Damage Sublimit Endorsement (Count V)

HCC's Count V seeks a declaration that the Policy's Property Damage Sublimit Endorsement limits any coverage for the 2018 Canola Claim to $100,000.  (Compl. ¶¶ 48–53.)  The original text of the Policy includes an exclusion for Property Damage.  (Policy § V.(I).)   "In consideration of the premium charged," the Property Damage Sublimit Endorsement amends the Policy to delete the Property Damage exclusion to add the following:

> It is further understood and agreed that a Sublimit of Liability in the amount of USD100,000 for any one Claim and USD100,000 in the aggregate shall apply to any Loss . . . that an Insured shall become legally obligated to pay as a result of a Claim based upon or arising out of Property Damage.

> It is further understood and agreed that this Sublimit of Liability is part of, and not in addition to, the Limit of Liability stated in the Declarations of this Policy.  Payment of Loss . . . pursuant to this Endorsement shall reduce the available Sublimit of Liability, which will also reduce the available Limit of Liability of this Policy.

(*Id.* Endorsement No. 5.)   Relatedly, the Policy defines "Property Damage" to mean "(1) physical injury to, or destruction of, tangible property including loss of use resulting therefrom; or (2) loss of use of tangible property that has not been physically injured or destroyed."  (*Id.* § IV.(X).)

HCC moves for partial summary judgment on this issue.  (HCC's MSJ 22–25.)  It argues the harm the 2018 growers suffered was damage to their crops and loss of use of their farmlands, which is Property Damage under the Policy, so the Property Damage Sublimit Endorsement indisputably applies.   (*Id.*)   Cibus moves for partial summary judgment in its favor, seeking a determination that the endorsement cannot apply to the growers' claims based on economic losses.  (Cibus's MSJ 21–25.)

The parties cite a collection of cases that interpret insurance policy provisions concerning property damage in comparable circumstances.  Several of these cases support

- 19 -

HCC's position because they conclude a loss of crop yield or crop damage is a type of "property damage" under policies that have similar or nearly identical definitions of this term.  *See, e.g.*, *Hendrickson v. Zurich Am. Ins. Co. of Ill.*, 72 Cal. App. 4th 1084, 1090–92 (1999) (concluding growers' complaint alleging loss of strawberry production, "and thereby a loss of use of their land," presented "a potential for coverage" requiring defense under policy where "property damage" included "loss of use" of tangible property); *see also Ferrell v. W. Bend Mut. Ins. Co.*, 393 F.3d 786, 794 (8th Cir. 2005) (applying Wisconsin law to conclude damage to tomato plants due to defective plastic film qualified as "property damage" under policy, despite that "damages at trial were measured in terms of lost profits"); *Safeco Ins. Co. v. Munroe*, 165 Mont. 185, 192 (1974) (concluding "wheat field and the crop therein" was tangible property, triggering policy's coverage for "damages for loss of use of property resulting from injury to tangible property"); *Scottsdale Ins. Co. v. TL Spreader, LLC*, No. 6:15-CV-2664, 2017 WL 4779575, at *5–6 (W.D. La. Oct. 20, 2017) (applying Louisiana law to conclude damage to rice crop and crawfish crop from herbicide and pesticide application triggered coverage for property damage claims).

Generally, however, these cases interpret policy language that grants coverage, not language that excludes or limits coverage like here.  Cibus points to two cases where analogous property damage exclusions did not preclude coverage for seed claims.  *See Ranger Ins.*, 125 Or. App. at 333 (concluding cost of weed eradication under policy was not excluded as "property damage" because that construction "would eviscerate the policy's coverage provisions" and render the policy "virtually useless"); *Union Warehouse*, 917 P.2d at 1307 (affirming trial court's determination that property damage exclusion did not apply where seeds contaminated with weeds resulted in crop yield loss but not damage to the growers' real property).

The Court agrees with Cibus that the Property Damage Sublimit Endorsement does not apply to the 2018 Canola Claim.  The 2018 Canola Claim consists of growers' claims for "monetary compensation" in light of "substantial yield loss" from Cibus's non-performing canola.  (Cibus's Opp'n Ex. G.)  There is no allegation of damage to their

property.  (*Id.*)  And the purpose of the Policy is to provide coverage for certain claims arising from "services as a Seedsmen, for others for a fee."  (*Id.* Endorsement No. 1.)  An insured who is in the business of selling seeds would reasonably expect the Policy to apply to a claim that the seeds it sold did not grow enough crops.  It makes no sense that Cibus would purchase the Policy if it expected otherwise.  *See St. Paul Fire*, 101 Cal. App. 4th at 1058 (noting the court's reasonable expectations inquiry "requires a consideration of the policy as a whole, the circumstances of the case in which the claim arises and 'common sense'").  Yet, under HCC's interpretation, the Policy's Property Damage exclusion as originally written would have excluded coverage for the 2018 Canola Claim altogether.  *But see Gray v. Zurich Ins. Co.*, 65 Cal. 2d 263, 278 (1966) ("The courts will not sanction a construction of the insurer's language that will defeat the very purpose or object of the insurance.").  Now, considering the Property Damage Sublimit Endorsement's changes, HCC argues the Policy permits just $100,000 in coverage out of a $2 million policy limit for a crop yield loss claim like the 2018 Canola Claim.

Because HCC's interpretation would vitiate coverage in circumstances where the Policy would lead an insured to reasonably expect coverage, the rule that the exclusionary language must be clear and unambiguous "applies with particular force."  *MacKinnon v. Truck Ins. Exch.*, 31 Cal. 4th 635, 648 (2003); *see also St. Mary*, 57 Cal. App. 5th at 825 ("[E]xclusionary clauses and limitations on coverage are interpreted narrowly against the insurer.").  It is not clear that the Property Damage Sublimit Endorsement would apply in these circumstances where the 2018 growers did not allege damage to any of their property but sought renumeration for low yields and related economic losses.  *See Nissel v. Certain Underwriters at Lloyd's of London*, 62 Cal. App. 4th 1103, 1111 (1998) (providing policy language must be construed "in the circumstances of th[e] case").  And because the Court concludes HCC's competing interpretation of the endorsement is inconsistent with the insured's reasonable expectation of coverage, the Court concludes Cibus's interpretation should prevail.

19cv0828

Accordingly, the Court grants Cibus's motion for summary adjudication of Count V and denies HCC's cross-motion on this claim.[4]

## MOTION TO BIFURCATE

HCC moved to bifurcate the coverage claims from Cibus's breach of contract and bad faith counterclaims.  (ECF No. 33.)  "For convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues, claims, crossclaims, counterclaims, or third-party claims." Fed. R. Civ. P. 42(b).  Rule 42(b) "confers broad discretion upon the district court to bifurcate a trial, thereby deferring costly and possibly unnecessary proceedings pending resolution of potentially dispositive preliminary issues." *Zivkovic v. S. Cal. Edison Co*, 302 F.3d 1080, 1088 (9th Cir. 2002).

HCC argued bifurcation of Cibus's breach of contract and bad faith counterclaims is appropriate because Cibus cannot prevail on these claims unless there is coverage under the Policy.  (ECF No. 33.)  Cibus opposed.  (ECF No. 46.)

At oral argument, the Court said it would grant the motion to bifurcate and separate the coverage claims from Cibus's two counterclaims concerning the handling of the 2018 Canola Claim.  (ECF No. 81.)  *See Waller*, 11 Cal. 4th at 36 (providing "there can be no action for breach of the implied covenant of good faith and fair dealing" if there is no coverage under the policy); *see also, e.g.*, *Jelinek v. Am. Nat'l Prop. & Cas. Co*, No. C15-779RAJ, 2016 WL 5795277, at *1 (W.D. Wash. May 23, 2016) (bifurcating coverage claim from "issues arising from Defendant's handling of Plaintiff's insurance claim").  That said, Cibus drew the Court's attention to Cibus's affirmative defenses to HCC's recoupment claim, including Cibus's unclean hands and waiver defenses.  Cibus argued HCC's alleged mishandling of the 2018 Canola Claim caused the amount of the claim to grow significantly, which impacts the amount HCC may be entitled to recoup from Cibus.  *See State Farm Fire & Cas. Co. v. Wier*, No. A125563, 2012 WL 5279790, at *14–17 (Cal. Ct. App. Oct. 26, 2012) (unpublished) (analyzing waiver, unclean hands, and other defenses

---

[4]  Because the Court does not grant summary judgment in HCC's favor, the Court does not reach HCC's arguments concerning Cibus's counterclaims.  (*See* HCC's MSJ 22.)

that were raised to an insurer's recoupment claim brought under *Buss v. Superior Court*, 16 Cal. 4th 35 (1997)).  In response, HCC suggested the Court could also bifurcate the insurer's recoupment claim to confine any evidence about the handling of the 2018 Canola Claim to the second phase of trial.  The Court said it would issue a written order.

Having further considered the impact of Cibus's affirmative defenses to HCC's recoupment claim, the Court finds bifurcating this claim is appropriate.  Hence, the Court clarifies its order at oral argument on HCC's Motion to Bifurcate as follows.  The first phase of the trial will be limited to only the issues concerning coverage under the Policy.  If there is no coverage, the Court will then try HCC's recoupment claim and any defenses to this claim.  If there is coverage, however, the Court will then try Cibus's counterclaims for breach of contract and bad faith and HCC's defenses to these claims.

## CONCLUSION

For the foregoing reasons, the Court **DENIES** HCC's Motion for Summary Judgment or Partial Summary Judgment (ECF No. 34).  The Court also **GRANTS IN PART** and **DENIES IN PART** Cibus's Motion for Partial Summary Judgment (ECF No. 40).  Specifically, the Court:

(1)  summarily adjudicates HCC's Count I (Compl. ¶¶ 22–29) concerning whether the 2018 Canola Claim was made before the Policy Period in favor of Cibus and against HCC;

(2)  summarily adjudicates HCC's Count III (Compl. ¶¶ 37–47) concerning the Insurance Requirement Endorsement in favor of Cibus and against HCC; and

(3)  summarily adjudicates HCC's Count V (Compl. ¶¶ 48–53) concerning the Property Damage Sublimit Endorsement in favor of Cibus and against HCC.

The Court otherwise denies Cibus's Motion.  Further, the Court clarifies its oral ruling on HCC's Motion to Bifurcate (ECF No. 33) as described above.

Finally, the Court orders the parties to jointly contact the Magistrate Judge to discuss resetting the remaining pretrial deadlines and scheduling trial, as well as whether another

19cv0828

settlement conference is appropriate.  (*See* ECF No. 78 (Lopez, J.) (vacating pretrial and trial deadlines).)

  **IT IS SO ORDERED.**


**DATED: September 27, 2021**

Hon. Cynthia Bashant
United States District Judge