UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HOUSTON CASUALTY COMPANY<br><br>                              Plaintiff,<br><br>v.<br><br>CIBUS US LLC,<br><br>                              Defendant. | Case No.:  19cv828-JO-AGS<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING PHASE I TRIAL** |

## I. INTRODUCTION

On May 3, 2019, Plaintiff Houston Casualty Company ("HCC") filed this action to dispute whether Defendant Cibus US LLC ("Cibus") was entitled to coverage under its Professional Liability Errors and Omissions policy (the "Policy"). HCC brought six declaratory relief claims requesting a Court finding that Cibus was not entitled to insurance coverage and seeking recoupment of the $2 million that HCC already paid under the Policy. Dkt. 1. Cibus asserted counterclaims against HCC seeking a declaration of coverage and

alleging two additional claims for breach of contract and breach of the covenant of good faith and fair dealing. Dkt. 10.

Prior to trial, the parties moved for summary judgment and to bifurcate the action. On September 27, 2021, Judge Cynthia A. Bashant granted summary judgment dismissing HCC's first, third, and fifth declaratory relief claims. Judge Bashant also bifurcated the trial into a Phase I, to try the declaratory judgment claims concerning coverage, and then a Phase II, to try either HCC's recoupment claim or Cibus's counterclaims for breach of contract and bad faith, depending on the outcome of Phase I.[1] Beginning on September 26, 2022, the Court held the Phase I bench trial to try HCC's three remaining claims for declaratory relief: (1) its second claim based on "Prior Knowledge of Circumstances"; (2) its fourth claim based on "Breach of Warranty Exclusion"; and (3) its sixth claim based on "Retroactive Date [of the Policy]."

Throughout the course of the one-week bench trial, the Court heard testimony and received numerous exhibits into the record. The Court heard live witness testimony from Ms. Sarah Crabtree, Mr. Jerry Cass, Dr. Linda Hall, Dr. Peter Beetham, Dr. James Radtke, Ms. Denise Schmidt, and Dr. David Sippell, and deposition testimony from Mr. Jeremy Sulatyski, Ms. Schmidt, Mr. Thomas Harmeyer, Ms. Crabtree, and Dr. Radtke. Dkt. Nos. 147–150, 155, 161. The Court also received approximately sixty-one exhibits into the evidentiary record. Dkts. 157, 162. Based on the totality of the evidence presented, the Court makes the following findings of fact and conclusions of law with respect to HCC's second, fourth, and sixth claims for declaratory relief.

## II. FINDINGS OF FACT

Overview

1. Cibus is a start-up company that designed, produced, and sold canola seeds intended to be tolerant to sulfonylurea ("SU"), an herbicide popularly known as Draft. In 2015, Cibus developed two canola seeds, the Duo "C5507" and "C5522" hybrids,

---

[1] The case was transferred to the undersigned on January 5, 2022.

which contained two copies of the SU tolerant gene. Around the same time that Cibus tested and sold these Duo hybrids, Cibus also worked on developing a new kind of canola seed containing four copies of the SU tolerant gene, referred to as the "Quattro" hybrid.

2. On October 5, 2017, Cibus applied to HCC for professional liability insurance coverage. Ex. DE. HCC issued a Professional Liability Errors and Omissions Policy No. H717-110623 to Cibus for the period from November 1, 2017 to November 1, 2018, with a $2 million limit of liability. Ex. 1 (the "Policy").

3. In February of 2018, Cibus decided to sell their Duo C5507 and C5522 canola seeds to farmers in Canada and the United States.

4. During summer of 2018, Cibus received around thirty-five complaints, primarily from farmers in Canada, complaining about the poor performance of the Duo C5507 and C5522 seeds. These farmers proceeded to make claims against Cibus for the poor performance of these seeds.

5. While HCC paid these claims against Cibus up to the Policy limit of $2 million, it reserved its right to dispute coverage and seek recoupment of these amounts.

<u>The Policy</u>

6. The language of the Policy provides that HCC "shall pay Loss and Claim expenses . . . that an Insured shall become legally obligated to pay as a result of a Claim made against an Insured for a **Wrongful Act** arising from Professional Services" provided that "an Insured's partners, principals, officers, directors, members or risk managers had no knowledge of any circumstances, dispute, situation, or incident that could reasonably have been expected to give rise to such Claim prior to the **Knowledge Date**; and . . . the Wrongful Act takes place on or after the **Retroactive Date** . . . and prior to the end of the Policy Period." Policy § I.(A).

7. The Policy defines a "Wrongful Act," in relevant part, as "any actual or alleged negligent act, error or omission committed or allegedly committed by any Insured

solely in connection with the rendering of Professional Services. For all purposes under this Policy, the same Wrongful Act or any Interrelated Wrongful Acts shall be deemed to have been committed at the time when the first such Wrongful Act was Committed." Policy § IV.(CC). The Policy defines "Interrelated Wrongful Acts" as "all Wrongful Acts that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of causally connected facts, circumstances, situations, events, transactions, or causes."

8. Pursuant to the Policy, the Knowledge Date is November 1, 2017.

9. Pursuant to the Policy, the Retroactive Date is November 1, 2016.

10. Pursuant to Endorsement 8 of the Policy, if the Wrongful Act occurred before November 1, 2016, no coverage is afforded under the Policy; if the Wrongful Act occurred between November 1, 2016 and November 1, 2017, the applicable Policy limit is $1 million; and if the Wrongful Act occurred after November 1, 2017, the applicable Policy limit is $2 million.

11. The Policy contains a "Breach of Warranty Exclusion," which provides that the Policy does not cover a Claim "based upon or arising out of breach of any warranty or guaranty made by any Insured unless such liability would have attached to that Insured even in the absence of such warranty or guaranty." Policy § V.K.

Pre-2018 Performance of the Duo "C5507" and "C5522" Canola Seeds

12. In 2017, Cibus conducted a trial program of its newly developed Duo C5507 and C5522 hybrids. Cibus provided free Duo hybrid seeds to over one hundred farmers in Canada and the United States who agreed to try growing these seeds. During this 2017 trial program, Cibus received reports that many of the Canadian farmers who had tried the Duo seeds observed a degree of phytotoxicity, harmful effects to a crop from an herbicide, that resulted in reduced crop yields. These reports of reduced crop performance in Canada contrasted with the positive performance of the C5507 hybrid in 2017 reported by farmers in the United States. Cibus received negative

feedback regarding 61% of acres grown by Canadian farmers, whereas the negative feedback from United States farmers was only 4%.

13. After receiving the 2017 feedback from Canadian farmers who experienced poor yields during the trial program, Cibus conducted an investigation. It discovered that Canadian farmers applied the herbicide at a different rate and higher potency as compared to the United States farmers. Cibus concluded that the crop injury these Canadian farmers experienced was the result of improper application of Draft herbicide and differences in agricultural practices.

14. In order to assist other farmers to avoid crop injury, Cibus developed a series of detailed instructions on how and when to apply the herbicide to the C5507 and C5522 crops to avoid crop damage. Cibus called this hands-on instructional program the "White Glove program." Through this program, Cibus employees worked directly with farmers in 2018 regarding correct herbicide application procedures.

15. In addition to the above free seed trial program, Cibus further tested the performance of its Duo products on small plots of land in Canada in 2016 and 2017. Cibus referred to these trials as the "small-plot herbicide spray trials." *See* Exs. 7, 8, 9 (charts showing aggregated data from 2016 and 2017 small-plot herbicide spray trials).

16. The Court finds that testing data from the 2016 and 2017 small-plot herbicide spray trials showed phytotoxicity scores in excess of 10% for the Duo C5507 and C5522 hybrids. *See* Exs. 7, 8, 9. This testing data also showed that while the Duo hybrids initially had higher phytotoxicity and lower yield performance at the start of the growing season, the yield performance leveled out to commercially acceptable levels by the end of the growing season. *See id*.

17. In 2017, Cibus's sales teams also conducted commercial strip trials in the United States comparing end of season yields for the Duo C5507 and C5522 hybrids, the Quattro hybrid, and other competitive hybrids on the market. *See* Ex. 13-2

5

(compilation of 2017 strip trial results in North Dakota). Compared to the small-plot herbicide spray trials, these strip trials were larger-scale field trials conducted on significantly larger plots of land.

18. The Court finds that the strip trials in 2017 for commercial purposes showed that the yield performance of the Duo C5507 and C5522 hybrids performed well and produced crop yield roughly equivalent to that of the Quattro hybrid and other leading competitive hybrids on the market. *See* Exs. 13-2, HP.

Expert Testimony on Duo C5507 and C5522 Performance

19. Dr. Linda Hall, HCC's expert on weed science, plant physiology, and gene-flow, testified about the phytotoxicity of the Duo C5507 and C5522 hybrids. She explained that the Canadian standard for maximum acceptable phytotoxicity is 10% and testified that the small-plot trials for the Duo C5507 and C5522 hybrids revealed phytotoxicity scores in excess of that standard. She further testified that phytotoxicity scores are significant because of what they forecast about crop yield—higher phytotoxicity scores are associated with lower crop performance. In comparison, Dr. Hall testified that the testing data of the Quattro hybrids in development by Cibus showed phytotoxicity scores to be within or close to the 10% standard.

20. She opined based on 2017 phytotoxicity data from the small-plot spray trials that the C5507 and C5522 crop injury and yield losses in 2017 stemmed from their lack of herbicide tolerance from having only two copies of the resistant gene, whereas the Quattro hybrids had higher herbicide tolerance due to having four copies of the resistant gene. Dr. Hall opined that, based on this phytotoxicity data and related summary reports and presentations, Cibus should reasonably have known in 2017 that the Duo hybrids were not sufficiently herbicide tolerant and therefore would not perform well. In forming her expert opinion, Dr. Hall did not consider the 2017 strip trial data from the United States, which reflected field performance from significantly larger plots of land compared to the smaller plot spray trials on only

around two by ten meters. She also did not consider the positive feedback received from United States farmers who participated in the trial program.

21. Dr. James Radtke provided both fact and expert testimony for Cibus as the senior VP of product development and an expert in plant breeding and genetics. Dr. Radtke agreed with Dr. Hall that the small-plot spray trial data from 2016 and 2017 of the C5507 and C5522 hybrids showed phytotoxicity levels in excess of 10%. He pointed out, however, that the initial high phytotoxicity and low yield performance eventually leveled out to commercially acceptable yield levels by the end of the growing season. *See* Exs. 7, 8, 9.

22. Dr. Radtke testified that, in 2017, Cibus viewed the higher phytotoxicity scores of the Duo C5507 and C5522 hybrids to be acceptable because of the positive yield performance of these seeds. He testified that yield is the most important factor to a farmer and the main metric to gauge the performance of a hybrid seed like the Duo C5507 and C5522 hybrids.

23. Based on the totality of the information that Cibus had in 2017 from (1) participating farmers in the free seed trial program, (2) the small-plot spray trials, and (3) the large-scale strip trials in the United States that showed these Duo hybrid seeds were comparable to the Quattro hybrid and other competitive hybrids on the market, Dr. Radtke testified that it was reasonable for Cibus to conclude it could confidently move forward with the Duo hybrids as a commercially viable product.

24. Dr. Radtke also opined that, based on the information Cibus gathered from the 2017 free seed trial program, it was reasonable for Cibus to believe the adjustments made through the White Glove program would help solve the crop injury problems experienced by some of these farmers.

25. The Court finds Dr. Radtke's testimony that Cibus did not have reason to know that its seeds would fail in 2018 to be credible and supported by the weight of the evidence. While the Court finds Dr. Hall to be a highly qualified expert, the Court affords her opinion less weight because she based her opinion only on limited small-

plot trial data and phytotoxicity levels rather than the entirety of available information regarding yield performance. The Court finds Dr. Radtke's opinions based on the totality of pre-2018 yield performance data to be more credible and reliable.

26. The Court also finds credible Dr. Radtke's testimony that yield is the most important metric for seed performance; this opinion was supported by Dr. Hall's testimony that phytotoxicity matters because of its impact on yield.

27. Based on Dr. Radtke's testimony and the Court's own factual assessment of the evidence in the record, the Court finds that it was reasonable for Cibus to conclude that its Duo C5507 and C5522 hybrid canola seeds were a viable commercial product for the 2018 growing season. The Court finds that Cibus did not have reason to believe otherwise.

## Decision to Sell Duo C5507 and C5522 for the 2018 Growing Season

28. The Court finds credible Dr. David Sippell's testimony that after collecting and evaluating testing data from the 2017 strip trials, Cibus made the final decision to sell the C5507 and C5522 hybrid seeds to farmers for the 2018 growing season in February 2018.

29. The Court finds credible Dr. Sippell's testimony that Cibus could not make its final decision to sell the C5507 and C5522 hybrid seeds for the 2018 growing season until February 2018 because Cibus needed to know how much and what quality of seed was available and to wait to finalize contracts with third-party grain purchasers.

30. Dr. Peter Beetham also testified that Cibus was new to the Canadian market in 2017 and still trying to develop relationships with farmers; selling bad seeds resulting in crop injury would severely impact Cibus's ability to expand in an industry that is largely relationship-based. The Court finds Dr. Beetham to be credible. The Court also finds credible Dr. Radtke's testimony that Cibus would not have distributed the Duo C5507 and C5522 hybrids to farmers if it thought the seeds would not produce

because selling bad seeds is simply not good for the reputation and business of a newcomer to this field.

2018 Canola Claims

31. In August 2018, Cibus received claim notices from farmers who purchased the Duo C5507 and C5522 hybrid seeds seeking monetary damages for injury to their crops and low yield. Cibus received around thirty-five claims in total with similar allegations (the "2018 Canola Claims").

32. The claim forms submitted by these farmers sought monetary compensation regarding "the non-performance" of the Cibus canola and a "substantial yield loss resulting in reduced per acre return and significant loss of revenue per acre." Ex. DC.

33. Ms. Sarah Crabtree also testified that farmers made claims to Cibus seeking monetary damages for crop injury and low yield in 2018. She further testified that farmers complained that Cibus gave them ineffective growing advice during the growing season.

34. Cibus sought coverage under the Policy for the 2018 Canola Claims from the farmers who bought their seeds. HCC agreed to defend Cibus in connection with the 2018 Canola Claims, subject to a full reservation of rights.

Warranties

35. Ms. Denise Schmidt testified that Cibus had an established policy to not make any express warranties or representations to farmers as to the performance of a seed hybrid, the degree of phytotoxicity when sprayed with Draft herbicide, or the yield that would be produced. The Court finds Ms. Schmidt's testimony to be credible.

36. Ms. Schmidt further testified that Cibus sales employees made marketing statements to farmers consistent with the following:
    a. The SU canola is non-GMO.
    b. If the Draft herbicide is applied properly, the SU canola is tolerant.
    c. The SU canola will help increase a return on investment and profitability.

37. These marketing statements made by the sales employees did not include representations about performance and yield.
38. The Court also finds credible Ms. Schmidt's testimony that this policy of not making warranties about seed performance is standard in the seedsman industry because so many unexpected factors are at play.
39. Based on Ms. Schmidt's testimony, the Court finds that Cibus had a policy, consistent with industry standard, to not make any express warranties or representations to farmers about the performance of a seed hybrid or the degree of phytotoxicity.
40. Dr. Sippell testified that Cibus regularly trained its sales staff to not promise yield levels or phytotoxicity levels of the seed, as part of the industry standard. Dr. Sippell further testified that Cibus, consistent with industry standards, made only a few warranties regarding the C5507 and C5522 hybrids. Cibus's warranties (1) addressed hybridity and germination levels; (2) promised that the bag contained the correct seed as labeled; and (3) disclaimed other warranties. Cibus printed these standard warranties, including the disclaimer, on the bag itself. The Court finds Dr. Sippell's testimony to be credible.
41. Ms. Crabtree further testified that no farmers made a claim for breach of warranty. The Court finds Ms. Crabtree's testimony to be credible in this regard.
42. The law firm Thompson Dorfman Sweatman LLP representing the parties during the Cibus claims process issued a report to HCC describing Cibus's exposure to liability for the 2018 Canola Claims. This report concluded that Cibus may be liable for the breach of two statutorily implied warranties under the laws of Manitoba and Saskatchewan. Ex. 28.

///
///
///

### III. CONCLUSIONS OF LAW

<u>Jurisdiction</u>

43. HCC is a citizen of Texas and Cibus is a citizen of another state.[2] The amount in controversy exceeds the sum of $75,000, exclusive of interests and costs. Because there is complete diversity between the parties and the amount in controversy exceeds the sum of $75,000, the Court has jurisdiction over this action. 28 U.S.C. § 1332.

<u>Venue</u>

44. Venue is proper in this Court under 28 U.S.C. § 1391(a)(1) because the sole defendant resides in this District. Venue is also proper pursuant to 28 U.S.C. § 1391(a)(2) because a substantial part of the events or omissions giving rise to the claims at issue occurred in this District.

<u>Law Governing Construction of Insurance Contracts</u>

45. As the party asserting claims for declaratory relief, HCC has the burden of proving every essential element of those claims. *Dir., Office of Workers' Comp. Programs, Dept. of Labor v. Greenwich Collieries*, 512 U.S. 267, 275 (1994). As the insurance company, HCC also has the burden of proving any applicable exclusions from coverage. *Unified Western Grocers, Inc. v. Twin City Fire Ins. Co.*, 457 F.3d 1106, 1111 (9th Cir. 2006).

46. California law governs the Policy. *Intri-Plex Techs., Inc. v. Crest Group, Inc.*, 499 F.3d 1048, 1052 (9th Cir. 2007). Insurance policies are contracts governed in part by ordinary rules of contractual interpretation, but with special protections for policyholders. *MacKinnon v. Truck Ins. Exch.*, 31 Cal. 4th 635, 648 (2003). While the insured has the burden to establish that a claim is within the basic scope of coverage, clauses in the insurance contract granting coverage are construed broadly whereas exclusions must be "interpreted narrowly against the insurer." *Id.*

---

[2] While it is disputed whether Cibus is a citizen of California, Delaware, or the British Virgin Islands, both parties agree that Cibus is not a citizen of Texas.

Exclusionary language is held to the highest standard of scrutiny, and must be "conspicuous, plain, and clear." *Id.* (quoting *State Farm Mut. Auto Ins. Co. v. Jacober*, 10 Cal. 3d 193, 201–02 (1973)).

**A.  HCC's Sixth Claim for Relief**

47. The Court first addresses HCC's Sixth Claim for Relief seeking a judicial declaration that Cibus is not entitled to coverage because its "Wrongful Act" as defined by the Policy occurred before the Retroactive Date.

48. To prevail on its Sixth Claim for Relief, HCC must prove by a preponderance of the evidence that

   a. The Canola Claims were written demands for monetary damages or non-monetary relief made against Cibus, or any other Insured;

   b. For an actual or alleged negligent act, error, or omission committed by Cibus in connection with the rendering of Professional Services;

   c. That took place before November 1, 2016, rendering Cibus ineligible for coverage, or in the alternative, took place between November 1, 2016 and November 1, 2017, rendering Cibus eligible for only $1 million in coverage.

49. There was no dispute at trial that the 2018 Canola Claims constituted written demands as required by the Policy.  What the parties dispute is the nature of the "Wrongful Act" and when it occurred.  HCC contended at trial that the Wrongful Act was the poor design of the Duo hybrid seeds with only two copies of the tolerant gene such that they were not sufficiently tolerant to Draft herbicide.  HCC further argued that because Cibus designed this seed in 2015, the Wrongful Act took place prior to November 2016 and was therefore not covered by the Policy.

50. The Court disagrees.  The Policy provides that HCC "shall pay Loss and Claim expenses . . . that an Insured shall become legally obligated to pay as a result of a Claim made against an Insured for a **Wrongful Act** arising from Professional Services."  The Wrongful Act, in turn, is defined as "any actual or alleged negligent act, error or omission committed or allegedly committed by any Insured solely in

connection with the rendering of Professional Services." Based on the plain language of the Policy, the Wrongful Act is the actual or alleged "negligent act, error, or omission" that forms the basis of the farmers' claims against Cibus. In this case, the farmers made claims against Cibus for the poor performance of its seeds in 2018 and sought "compensation regarding the non-performance of [their] Cibus canola in the growing season of 2018." Ex. DC. Ms. Crabtree, HCC's claims handler, testified that she received complaints from the farmers about the seed's low crop yield and ineffective growing advice from Cibus. Essentially, the farmers complained that Cibus sold them poor performing C5507 and C5522 seeds in 2018 for the 2018 growing season, not for Cibus's poor design of those seeds back in 2015.

51. Based on the above, the Court finds that the Wrongful Act as defined by the Policy—that is, the actual or alleged negligent act, error, or omission committed by Cibus that instigated the farmers' claims—was its decision to sell the Duo C5507 and C5522 seeds for the 2018 growing season. Consequently, all subsequent related actions to effect the sale of these seeds in 2018 are Interrelated Wrongful Acts.

52. Because Cibus made the decision to sell the C5507 and C5522 seeds to farmers for the 2018 growing season in February 2018, the Court finds that the Wrongful Act thus occurred in February 2018, after the Retroactive Date.

53. Based on the evidence presented, the Court finds that HCC has not proved by a preponderance of the evidence that Cibus's decision to sell the C5507 and C5522 seeds for the 2018 growing season took place before November 1, 2016, or in the alternative, took place between November 1, 2016 and November 1, 2017.

54. HCC's sixth claim for declaratory relief based on its argument that the Wrongful Act occurred prior to the Retroactive Date of the Policy is therefore DENIED.

**B. HCC's Second Claim for Relief**

55. The Court next addresses HCC's Second Claim for Relief seeking a judicial declaration that Cibus is not entitled to coverage for the 2018 Canola Claims because

      Cibus should have reasonably expected the Duo C5507 and C5522 hybrid crop failures in 2018 prior to the Policy's November 1, 2017 Knowledge Date.

56. The Policy excludes coverage for claims where "an Insured's partners, principals, officers, directors, members or risk managers had no knowledge of any circumstances, dispute, situation or incident that could reasonably have been expected to give rise to such Claim" prior to November 1, 2017. Ex. 1 at 1, 14.

57. Therefore, to prevail on its Second Claim for Relief, HCC must prove by a preponderance of the evidence that
    a. Cibus's partners, principals, officers, directors, members, or risk managers had knowledge of any circumstances, dispute, situation, or incident;
    b. That could reasonably have been expected to give rise to the 2018 Canola Claims;
    c. Prior to the Policy's November 1, 2017 Knowledge Date.

58. In this case, the poor performance of the Duo C5507 and C5522 hybrids in the 2018 growing season gave rise to the 2018 Canola Claims. The Court therefore examines whether Cibus could have reasonably expected the crop failures of 2018 based on the information available to it.

59. Cibus's 2016 and 2017 testing data from the Canadian small-plot trials indicated that the Duo C5507 and C5522 hybrids initially showed phytotoxic effects but over the growing season produced commercially acceptable yields. Cibus's 2017 commercial strip data from the United States indicated that the yield performance of the Duo hybrids was comparable to the Quattro hybrid and other competitive hybrids on the market. Feedback from United States and Canadian farmers during the 2017 free seed trial program revealed significantly better performance in the United States compared to Canada and differences in U.S. and Canadian herbicide application practices; this indicated to Cibus that a variation in cultural farming practices contributed to the poor crop results in Canada.

60. Based on the information available to Cibus, it was reasonable for Cibus to conclude that the Duo C5507 and C5522 hybrids would have acceptable yield performance in the 2018 growing season, especially in conjunction with the precautions and adjustments implemented through the White Glove program.

61. The Court therefore concludes that no Cibus partner, principal, officer, director, member, or risk manager could have reasonably expected, prior to November 1, 2017, the farmers' claims of crop injury and low yield in 2018. Accordingly, the Court concludes that the Policy's prior knowledge provision does not bar coverage for the 2018 Canola Claims.

62. HCC's second claim for declaratory relief based on the Policy's prior knowledge provision is therefore DENIED.

## C. HCC's Fourth Claim for Relief

63. Finally, the Court addresses HCC's Fourth Claim for Relief seeking a judicial declaration that the Policy's Breach of Warranty Exclusion precludes coverage for the 2018 Canola Claims.

64. The Policy excludes coverage for Claims "based upon or arising out of breach of any warranty or guaranty made by any Insured unless such liability would have attached to that Insured even in the absence of such warranty or guaranty." Ex. 1 at 27.

65. To prevail on its Fourth Claim for Relief, HCC must prove by a preponderance of the evidence that
   a. The Canola Claims are based upon or arise out of a breach of warranty or guaranty made by Cibus; and
   b. Such liability would not have attached to Cibus in the absence of such warranty or guaranty.

66. The Court concludes that the Policy's Breach of Warranty Exclusion does not preclude coverage because (1) the breach of an explicit warranty is not the basis of

the 2018 Canola Claims and (2) an implied warranty is not a warranty "made by the Insured" as required by the plain language of the Policy's exclusionary language.

67. The Court concludes that the 2018 Canola Claims did not stem from a breach of warranty for the following reasons. First, pursuant to Cibus's policy—consistent with standard practice in the seedsman industry—Cibus employees did not make warranties to the farmers about seed performance and yield. Second, the claim forms submitted by the farmers complained of "substantial yield loss resulting in reduced per / acre return and significant loss of revenue per acre" but make no mention of breach of warranty. Ms. Crabtree, the claims handler for HCC who responded to these claims, testified that farmers complained to her about the poor performance of the seeds and Cibus's ineffective growing advice, but made no mention of a breach of warranty.

68. In short, Cibus did not make express warranties about its seed performance and yield. Nor did any farmers complain or make claims based on the violation of any express warranties. Because the 2018 Canola Claims are not based on a breach of express warranty or guaranty made by Cibus, the exclusion set forth above does not apply.

69. Moreover, HCC argues that Cibus's breach of implied warranties subjected it to liability for the farmers' 2018 Canola Claims. The Court concludes that to the extent Cibus faced liability for breach of a statutorily implied warranty, such warranty arose by operation of law rather than being "made by the Insured" within the plain meaning of the Policy's breach of warranty exclusion.

70. The Court finds that even in the absence of such express warranty or guaranty, potential liability against Cibus could have been based on implied statutory warranties.

71. Based on the evidence presented, the Court finds HCC has not proved by a preponderance of the evidence that the 2018 Canola Claims by the farmers are based upon or arise out of a breach of warranty or guaranty made by Cibus and that such

liability would not have attached to Cibus in the absence of such warranty or guaranty. Accordingly, the Policy's Breach of Warranty exclusion does not bar coverage for the 2018 Canola Claims.

72. HCC's fourth claim for declaratory relief based on the Policy's Breach of Warranty exclusion is therefore DENIED.

## IV.   CONCLUSION

Based on the above, the Court denies HCC's claims for declaratory relief set forth in Counts Two, Four, and Six of its Complaint. Accordingly, the Court finds that coverage for the 2018 Canola Claims is afforded under the Policy.

**IT IS SO ORDERED**.

Dated: December 19, 2022

_____
Honorable Jinsook Ohta
United States District Judge