1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

9

SOUTHERN DISTRICT OF CALIFORNIA

10
11

| | |
|---|---|
| Houston Casualty Company,<br><br>                               Plaintiff,<br><br>v.<br><br>Cibus US LLC,<br><br>                               Defendant. | Case No.:  19cv828-JO-DDL<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING PHASE II TRIAL** |
| Cibus US LLC,<br><br>                    Counter Claimant,<br><br>v.<br><br>Houston Casualty Company,<br><br>                    Counter Defendant. | |

12
13
14
15
16
17
18
19
20
21
22
23
24

## I. INTRODUCTION

25

        The bench trial in this insurance action consisted of two phases: coverage and bad

26

faith.  After Phase I of the trial, the Court concluded that Houston Casualty Company

27

("HCC"), the insurer, owed coverage to Cibus US LLC ("Cibus"), the insured, under its

28

professional liability policy (the "Policy").  The Phase II trial of Cibus's claims for breach

1

of contract and breach of the implied covenant of good faith and fair dealing (*i.e.*, "bad faith") followed.  The Court issues the following Findings of Fact and Conclusions of Law to set forth its Phase II pretrial rulings and trial findings and conclusions.

## II. BACKGROUND

On May 3, 2019, HCC initiated this action to obtain a ruling that it did not owe coverage to Cibus under the Policy for professional liability insurance.  HCC, which had already paid $2 million under the Policy but with a reservation of rights to later dispute coverage, filed this complaint to recover the amounts it paid out.  Dkt. 1.  In response, Cibus asserted counterclaims for breach of contract and bad faith.  Dkt. 10.  The Court bifurcated the action into a Phase I to try the declaratory judgment claims concerning coverage, and a Phase II to try, depending on the outcome of Phase I, either HCC's recoupment claim or Cibus's counterclaims.  Following the Phase I bench trial on HCC's declaratory claims, the Court found Cibus was entitled to coverage under the Policy.

Phase II of the bench trial, which began on June 29, 2023, focused on Cibus's counterclaim for bad faith.[1]  Cibus contended that HCC acted in bad faith by unreasonably maintaining its position that no coverage existed under the Policy and filing the instant action to recoup the $2 million payment.  Cibus claimed entitlement to the following as a result of HCC's conduct: $2.3 million in attorney's fees incurred to defend the Phase I coverage action ("*Brandt* fees"), punitive damages, and interest.[2]

Throughout the course of the four-day bench trial in Phase II, the Court heard testimony from Sarah Crabtree, Denise Schmidt, David Sippell, Jerry Cass, Marc Halpern,

---

[1] Cibus did not separately address its express breach of contract claim at trial.  The Court presumes therefore that it alleges only that HCC breached its contract by virtue of breaching the implied covenant of good faith and fair dealing.  *Schwartz v. State Farm Fire & Cas. Co.*, 88 Cal. App. 4th 1329, 1339 (2001) ("It is well-established that a breach of the implied covenant of good faith is a breach of the contract . . . and that breach of a specific provision of the contract is not a necessary prerequisite") (citation omitted).

[2] During trial, Cibus stipulated to drop its theory of bad faith delay in HCC's claims handling.  Cibus also stipulated to withdraw its request for commercial and reputational damages.

Terrence McInnis, Jill Daly, and Stefano Minale.  Dkt. 226.  The Court also received approximately ninety-eight exhibits into the evidentiary record.  Dkts. 227–29.

### III. PRETRIAL RULINGS

The Court first addresses its rulings on two pretrial motions.  Prior to the start of Phase II, the Court permitted (1) Cibus to file a motion for leave to file a supplemental counterclaim, and (2) HCC to file a motion regarding the recoverability of *Brandt* fees in a recoupment action.  The Court held oral argument on March 29, 2023, and issued a bench ruling denying Cibus's motion to supplement.  It also issued a minute order ruling that *Brandt* fees incurred in defending a recoupment action could permissibly be recovered and stated that it would set forth its reasoning in the post-trial Findings of Fact and Conclusions of Law.

**A. Motion to Supplement Counterclaim**

At the close of Phase I and prior to Phase II, Cibus filed a motion to supplement[3] its bad faith counterclaim with additional allegations regarding HCC's litigation conduct following the filing of its complaint.  Dkt. 176.  The Court denied the motion on grounds of prejudice and delay, as set forth in its detailed ruling from the bench.  Dkts. 192–93.  As a result of the Court's ruling denying the motion to supplement, Cibus's original counterclaim remained the operative pleading for Phase II.

One day prior to the start of Phase II, HCC brought to the Court's attention a disagreement between the parties regarding the scope of the bad faith claim to be tried.  HCC contended that, as a result of the Court's ruling denying the proposed amendments, Cibus's bad faith claim did not include HCC's decision to file the instant action for declaratory relief and recoupment or the resulting damages in the form of *Brandt* fees to defend the coverage action.  Despite HCC's contention that the Court's questioning and comments during oral argument indicated that the bad faith action would not include the

---

[3] Cibus styled the motion as a "motion to amend and supplement," but the Court refers to it as a motion to supplement because the relevant facts at issue occurred after its filing of the initial counterclaim. *See* Fed. R. Civ. P. 15(d).

decision to initiate litigation, the Court agreed with Cibus that its ruling did not have that effect for the following reasons.  The original counterclaim states unequivocally that Cibus seeks the attorney's fees it would incur in defending the coverage action:  "As a proximate result of HCC's (mis)conduct, Cibus has been damaged as heretofore alleged, and has incurred substantial additional costs including . . . the attorney's fees, expenses and costs incurred to address HCC's . . . coverage defenses and to prosecute [the claims for declaration of coverage and breach of contract]" and requests relief "[f]or compensatory damages, including consequential damages and attorney's fees."  Dkt. 10 ¶ 54.  The Court finds that the language of the original counterclaim remained unaffected by the Court's ruling denying supplementation.  Moreover, the remainder of the oral argument discussions regarding the availability of *Brandt* fees in declaratory relief and recoupment actions, and the Court's subsequent ruling that such attorney's fees would be permissible in this type of action, reasonably placed HCC on notice that its decision to initiate litigation would be within the scope of the bad faith action.[4]

## B. Ruling on Permissibility of *Brandt* Fees

At the same time, HCC also filed a pretrial motion: one requesting a legal ruling that attorney's fees incurred by Cibus to defend the Phase I coverage litigation are not recoverable under *Brandt*.  In advancing this position, HCC argued that *Brandt* fees are only recoverable where coverage is denied in bad faith and a lawsuit must be filed to gain

---

[4] HCC argues that a bad faith action cannot rest on an insurer's recoupment action following a benefits payment under a reservation of rights.  HCC relies on inapposite case law for its argument.  In *Old Republic Ins. Co. v. FSR Brokerage, Inc.*, the court concluded that an insured cannot bring a bad faith claim against its insurer based solely on the allegations contained in the insurer's complaint.  80 Cal App. 4th 666, 686–87 (2000).  There, the insured asserted a bad faith claim against its insurer for filing a complaint for fraud against it, but it did not contend that the insurer otherwise acted unreasonably in investigating, handling, or failing to pay the underlying insurance claim.  *Id.* at 683–84.  Because the bad faith claim was based solely on the content of the insurer's complaint, the court therefore concluded that the litigation privilege barred the bad faith claim.  *Id.* at 686–87.  In contrast, Cibus premises its theory of bad faith on HCC's unreasonable coverage positions and biased investigation into the claim, which resulted in the initiation of the declaratory and recoupment action; the *Old Republic* case is therefore inapposite.

those insurance benefits—not when the insurer provides upfront payment under a reservation of rights and later seeks to recoup that amount. For the reasons set forth below, the Court concluded otherwise and ruled that *Brandt* fees may be available where an insurer's bad faith conduct necessitates the expenditure of attorney's fees, even when the litigation takes the form of a recoupment action filed by the insurer.

While the recovery of attorney's fees is ordinarily subject to the "American Rule," which states that each side must pay its own fees, *Marx v. General Revenue Corp.*, 568 U.S. 371, 382 (2013), an exception to this rule exists in insurance bad faith cases. In *Brandt v. Superior Court*, the California Supreme Court held that attorney's fees reasonably incurred by an insured to obtain its policy benefits are recoverable as tort damages for an insurance bad faith claim. 37 Cal. 3d 813, 817 (1985). Called *Brandt* fees, these attorney's fees are intended to compensate parties where an insurer's bad faith conduct forces the insured to spend attorney's fees to obtain the insurance benefits to which they are entitled. *Id.* Here, in order to retain the $2 million in coverage under the Policy, Cibus needed to defend the recoupment action by litigating its entitlement to coverage under the Policy. The Court sees no distinction between attorney's fees incurred to *obtain* coverage benefits because an insurer denies coverage and attorney's fees incurred to *retain* coverage benefits when an insurer tries to recoup them. In both situations, *Brandt* fees should be permissible if bad faith caused the insured to incur litigation costs merely to receive the benefits of their insurance coverage. The fundamental purpose of *Brandt* fees supports this outcome. *Id.* (explaining that where an insurer's bad faith required the insured to seek the services of an attorney, the legal fees are recoverable to compensate the insured "in the same way that medical fees would be part of the damages in a personal injury action"). Because the Court can discern no reason that *Brandt* fees would not be available solely because the issue of coverage was litigated in the posture of a recoupment action as opposed to a recovery action, it concluded that fees may be permissible in both types of actions.

HCC argues that the California Court of Appeal has ruled otherwise but the Court disagrees. Contrary to HCC's argument, *Griffin Dewatering Corp. v. N. Ins. Co. of N.Y*

does not indicate that *Brandt* fees would not be available in all recoupment actions.  176 Cal. App. 4th 172, 211 (2009).  There, the insurer agreed to defend the insured under a reservation of rights and then later withdrew its reservation, agreeing to provide full defense and coverage.  *Id.* at 211.  As a result, the insured in *Griffin* did not pay any defense costs or incur any losses, but still asserted a bad faith claim arguing that it did not receive the full benefits under the policy until the insurer withdrew its reservation of rights.  *Id.* Under those facts, the *Griffin Dewatering* court concluded that there was no withholding of benefits such that *Brandt* fees would be recoverable.  *Id.*  This holding is inapplicable to the case at hand because, unlike in *Griffin Dewatering*, Cibus did face real costs or injury as a result of HCC's alleged conduct—the loss of the entire $2 million in coverage benefits under its Policy.

## IV. FINDINGS OF FACT AND CONCLUSIONS OF LAW

1. The Court's Findings of Fact and Conclusions of Law regarding Phase I set forth the facts surrounding Cibus's development of the hybrid C5507 and C5522 canola seeds; its decision to sell these seeds to farmers in February 2018; the farmers' crop failures during the 2018 growing season; their claims against Cibus ("2018 Canola Claims"); Cibus's professional errors and omissions insurance policy with HCC; and the coverage dispute between Cibus and HCC.  To avoid repetition, the Court incorporates all Phase I Findings of Fact here.

**The Policy**

2. HCC issued a professional liability errors and omissions insurance policy to Cibus for the November 1, 2017 to November 1, 2018 policy period, with a policy limit of $2 million.  Ex. 1 (the "Policy").  Under this Policy, HCC had a duty to defend and indemnify third-party claims against Cibus arising from Cibus's professional services as a seedsman.  Policy § I(V).

3. Specifically, the Policy language provided that HCC "shall pay Loss and Claim expenses . . . that [Cibus] shall become legally obligated to pay as a result of a Claim made against [Cibus] for a Wrongful Act arising from Professional Services."  *Id.*

6

§ I(A).  A Wrongful Act, in turn, is defined as "any actual or alleged negligent act, error or omission committed or allegedly committed by any Insured solely in connection with the rendering of Professional Services."  Pursuant to these provisions, a "Wrongful Act" is the actual or alleged "negligent act, error or omission" that forms the basis of the farmers' claims against Cibus.  *Id.* § IV.CC.

4. The Policy required the Wrongful Act that triggered the assertion of the Claims to have taken place after November 2016.  The Policy limited coverage to only $1 million, instead of the full $2 million, for a Wrongful Act that took place before November 2017.  *Id.* § V.  This $1 million sublimit also applied if a Claim arising from the Wrongful Act was based on a related Wrongful Act committed before November 2017.  *Id.* §§ IV.J, VII.E.

5. The Policy contained additional limitations for coverage.  Pursuant to the Policy, no coverage existed if Cibus had "knowledge of any circumstances, dispute, situation, or incident that could reasonably have been expected to give rise to such Claim prior to [November 2017]."  *Id.* § I.(A).

6. The Policy also required Cibus to have a general liability insurance policy of at least $1 million in order to be eligible for coverage under the Policy with HCC.  *See* Policy Endorsement 6.  Specifically, the Policy provided that "as a condition precedent to all coverage under this Policy, each Insured warrants that it has obtained, and will maintain . . . GL insurance coverage."  The Policy did not define "GL insurance."

7. The Policy also contained a breach of warranty exclusion.  Under the Policy, no coverage existed for claims "based upon or arising out of breach of any warranty or guaranty made by the Insured unless such liability would have attached to the Insured even in the absence of such warranty or guaranty."  Policy § V.K.

8. Finally, the Policy contained a sublimit of $100,000 for losses or expenses from a claim based upon or arising out of "Property Damage."  Policy Endorsement 5.  "Property Damage" within the meaning of the Policy was "physical injury to, or destruction of, tangible property including loss of use resulting therefrom" or "loss

1  of use of tangible property that has not been physically injured or destroyed." Policy

2  § IV.X.

**Cibus Notifies HCC of Farmer Claims**

9. In June 2018, Cibus began to receive complaints from farmers in Canada and the Northern United States who purchased C5507 and C5522 seeds from Cibus in early April 2018.  These farmers complained that their crops during the 2018 growing season experienced crop damage after applying Draft herbicide, resulting in poor yield and lost revenues.

10. Cibus notified HCC of the farmers' complaints on July 16, 2018.

11. HCC assigned Sarah Crabtree as the claims adjuster for Cibus's claim.  Ms. Crabtree worked with her supervisors, Jill Daly, the senior VP of claims at HCC, and Stefano Minale, HCC's chief claims officer, on the claim.  Both Ms. Crabtree and Ms. Daly had law degrees and extensive legal experience, and Mr. Minale attended law school; all three had extensive experience adjusting professional liability claims.

12. On July 24, 2018, HCC approved the retention of the Troutman Sanders law firm and attorney Terrence McInnis as outside coverage counsel. Ex. RQ.  HCC retained Mr. McInnis because it believed that the Policy's Property Damage sublimit potentially applied to Cibus's claim and desired the advice of outside coverage counsel.

**Information Exchange Between HCC and Cibus**

13. Starting around August 1, 2018, Cibus sent field summary reports to HCC to provide further information about the farmers' grievances against Cibus in 2018. STIP022.  These field summary reports were prepared by Cibus sales representatives and detailed the information received from farmers about their experience with the C5507 and C5522 seeds during the 2018 growing season.

14. All of these field summary reports noted that farmers suffered loss of yield for their crops.  Some of these reports also noted that, after the herbicide application, the

farmers' crops had "visual damage" with "stunting and delayed maturity," resulting in poor crop yield.

15. On August 6, 2018, HCC requested additional information and documentation from Cibus related to the following: (1) copies of written claims against Cibus; (2) identification of the Wrongful Act alleged in the matter; (3) when the seeds at issue were manufactured, sold, and delivered by Cibus, and what services Cibus provided to these growers; (4) information regarding the 2017 incidents of irregular crop yields and whether those incidents involved the same seeds, damages, or herbicide; (5) past claims of similar damage to Cibus canola plants; and (6) copies of Cibus's other insurance policies including its general liability policy.  Ex. M.

16. Denise Schmidt, a member of Cibus's commercial sales team, testified that at the behest of HCC, Cibus gathered written claims from the complaining farmers in order to trigger the Policy.

17. Cibus received around thirty-five written claim forms from farmers seeking monetary compensation regarding "the non-performance" of the Cibus canola seeds that they purchased in early April 2018.  Farmer Michael Kolida submitted one of these claims seeking monetary damages for injury to his crops and low yield.  Ex. K.  His email stated that "[a]s per our discussions and field visits, my Cibus canola was clearly damaged after I applied the Draft chemical." All of these farmer claims complained of a "substantial yield loss resulting in reduced per acre return and significant loss of revenue per acre."  Ex. DC.

18. HCC received notice of these written claims on August 20, 2018.  Ex. K.  David Sippell, the Vice President of Seeds at Cibus, recognized the need to involve an experienced agronomist—a farming expert who understands and can assess the farmers' crop damage.  At Dr. Sippell's recommendation, HCC retained Mr. Cass as the agronomist to collect information from the farmers and handle their 2018 Canola Claims.  STIP028.

19. During the week of August 20, 2018, Mr. Cass visited the farmers to obtain more signed claim forms and to determine the farmers' degree of yield loss and resulting decrease in revenue.  STIP034.

**HCC's Claims Handling Investigation and Coverage Positions**

20. On August 30, 2018, HCC agreed to defend Cibus in connection with the 2018 Canola Claims.

21. On September 5, 2018, Ms. Crabtree raised the issue of whether the Property Damage sublimit in the Policy might apply to limit Cibus's coverage.  STIP036. According to her testimony, Ms. Crabtree believed the Property Damage sublimit applied based on Mr. Kolida's email stating his "Cibus canola was clearly damaged after [he] applied the Draft chemical."  She also testified that she believed the sublimit applied because the field summary reports indicated the herbicide caused physical damage to the crops such as yellowing, wilted leaves, and "stunting and delayed maturity."

22. Ms. Crabtree notified Cibus's insurance broker that she believed the Property Damage sublimit may apply.  The broker informed Ms. Crabtree that the farmers' claims did not allege property damage but that "the seed did not yield as much crop as expected, resulting in economic losses."  The broker further asserted that the purpose of an errors and omissions insurance policy is to cover "the failure of the product to perform and the consequent economic losses (*e.g.*, loss of a season's crop) that result from that failure."  STIP036.

23. On September 26, 2018, Ms. Crabtree suggested to Cibus's insurance broker that Mr. Cass visit the farmers to determine the causation of the crop injury.  STIP047.

24. On October 2, 2018, HCC agreed to defend Cibus under the Policy but reserved its rights.  Ex. DG.  At this time, Mr. McInnis testified that he had reviewed only the field summary reports and the farmers' written claim forms.  He asserted a reservation of rights based on a lack of information for what constituted the Wrongful Act; the sublimit limiting coverage to only $100,000 for losses from

claims arising out of Property Damage; the requirement that Cibus maintain general liability insurance; the exclusion for claims arising from a breach of warranty; the requirement that the Wrongful Act be committed after November 2017; the requirement that Cibus cannot have prior knowledge of circumstances giving rise to the 2018 Canola Claims; and numerous other provisions in the Policy.  Ex. DG.

25. The October 2, 2018 reservation of rights letter also issued additional requests for information.  HCC requested information pertaining to (1) whether any of the farmers alleged a Wrongful Act; (2) when the seeds at issue were manufactured, sold, and delivered by Cibus, and what services Cibus provided to the farmers before May 2018; (3) details regarding the 2017 crop issues and whether they involved the same or similar seeds, damages, or herbicide at issue in the 2018 matter; (4) whether past claims of similar damage to Cibus canola have been reported; (5) whether Cibus had knowledge of any circumstances involving an adverse effect of herbicide on plant growth prior to 2018; (6) information Cibus has regarding the complaining farmers' use of herbicide on the crops; (7) Cibus's instructions or advice to growers on the use of herbicide; and (8) copies of Cibus's other insurance policies.  Ex. DG.

26. On October 18, 2018, Cibus selected the Thompson Dorfman Sweatman law firm (the "TDS Firm") as its defense counsel for the 2018 Canola Claims.  Ex. V.  HCC approved the retention and instructed the TDS Firm to investigate the 2018 Canola Claims, the cause of the loss, and potential defenses.  Ex. V ("HCC will instruct [defense counsel] to conduct an appropriate investigation into the growers' claims, the cause(s) of any alleged loss, and potential defenses to Cibus' liability for such loss.").

27. On November 7, 2018, Cibus advised HCC that it retained attorney Marc Halpern as coverage counsel.  STIP070.  (The October 2, 2018 letter from HCC reserving rights on various grounds caused Cibus to retain coverage counsel.)

28. On November 16, 2018, in response to HCC's October 2, 2018 requests for information, Mr. Halpern provided a copy of a commercial general liability policy

issued by Associated Industries Insurance Company ("AIIC").  STIP078.  He also provided a letter from AIIC denying coverage for Cibus on the grounds that the claims were not property damage claims and Cibus, the subsidiary company, was not a named insured under its policy.  Ex. 583.

29. Ms. Crabtree testified she did not review Mr. Halpern's November 16, 2018 communication or the denial letter from AIIC prior to her determination that the general liability requirement precluded coverage.

30. On November 21, 2018, the TDS Firm and Cibus agreed that Mr. Cass would be the appropriate agronomic expert to investigate the scientific root cause of the farmers' 2018 crop injury.  Ms. Crabtree testified that she requested Mr. Cass ascertain causation so that the TDS Firm and Mr. Cass could determine Cibus's liability for the 2018 Canola Claims.

31. On November 29, 2018, the TDS Firm, Cibus, and Mr. Cass held a meeting to discuss the 2018 Canola Claims.  (The meeting discussions were memorialized in a memorandum of the same date sent to Ms. Crabtree.)  Ex. 553.  The meeting memorandum indicated that Cibus advertised and promoted the canola seeds as "offering high yields and premium contract opportunities due to is [sic] non-GMO status" and as "being compatible with Rotam Draft herbicide."

32. During the meeting, the members also noted that all of the farmers' claims alleged loss of yield due to the underperformance of the canola seeds Cibus sold them in early 2018.  The TDS Firm recommended obtaining "an opinion with respect to Cibus' potential liability with respect to the sale of this hybrid canola," and, accordingly, it informed Ms. Crabtree that Mr. Cass would "provide an opinion on the performance of the Cibus canola during the 2018 growing season" and offer an expert report on this point.  Ex. 553.

33. On December 11, 2018, Mr. Cass gave HCC his report on the root cause of the crop injury experienced by the farmers in 2018.  Ex. 18 (the "Cass Report").

34. The Cass Report provided that, in 2017, Cibus conducted a seed trial of the C5507 and C5522 seeds in Canada.  Some of the farmers noted problems with these seeds, "which seemed to not tolerate the application of the Draft herbicide."  The Cass Report stated that Cibus hired consulting firm AgCall to determine the cause of the problems experienced in 2017.  AgCall, in turn, found that the Canadian farmers applied too much herbicide to the crops due to differences in the herbicide product labeling between Canada and the United States.  Consequently, AgCall informed Cibus that the 2017 crop damage resulted from improper herbicide application practices.

35. The Cass Report further provided that Cibus, in response to the AgCall analysis, developed a White Glove Program which provided detailed application instructions and customer service to ensure correct application practices for farmers in the 2018 growing season "to prevent a reoccurrence of problems experienced in 2017."

36. In his report, Mr. Cass also set forth his conclusion about the source of the crop performance problems gleaned from information newly obtained in 2018 and not available in 2017.  Mr. Cass noted in his report that, in the summer of 2018, Cibus tested new seed strains with two sets of herbicide tolerance genes.  This testing showed that the new seeds showed greater herbicide tolerance than the C5507 and C5522 seeds that Cibus decided to sell to farmers in early 2018 which only had one set of tolerance genes.  From this testing data and the information he gained regarding the farmers' crop failures, Mr. Cass concluded that the poor performance of the C5507 and C5522 seeds in 2018 was caused by their genetic design which produced insufficient herbicide tolerance.

37. On December 17, 2018, the TDS Firm issued a report to HCC to provide "an opinion on the potential liability of [Cibus] with respect to a number of claims being advanced with respect to the sale of allegedly defective canola seed during the 2018 farming season."  Ex. 28 ("TDS Report") (emphasis added).

38. The TDS Report reiterated the Cass Report's findings and relied on them for its conclusions.  Ex. 343.

39. Based on this information, the TDS Report offered its legal conclusion that Cibus would be liable for the 2018 Canola Claims based on a breach of statutory warranties under the laws of Manitoba and Saskatchewan.  The TDS Report explained Cibus would be liable for selling seeds that fell below a sellable level of quality because these laws imposed an implied warranty that the goods are reasonably fit to be sold. The TDS Report also noted that Cibus could be liable under a negligence standard, but primarily focused on the "breach of statutory warranty" given that the "negligence standard is usually more difficult for a plaintiff to establish[.]"  The TDS Report did not analyze or offer any legal conclusions regarding whether Cibus breached an express warranty.

40. The TDS Report recommended that HCC enter into discussions with the farmers to settle the 2018 Canola Claims because Cibus would be liable for breach of these statutory implied warranties.  On December 19, 2018, Cibus also expressed its desire to settle the 2018 Canola Claims.

**HCC's Payment of Benefits Under Reservation of Rights and Filing of the Declaratory and Recoupment Action**

41. On December 21, 2018, HCC informed Cibus that it agreed to pay the full $2 million Policy limit to settle the 2018 Canola Claims but reserved its rights to dispute coverage and seek recoupment of these amounts.  STIP096.  HCC set forth six grounds for its decision to reserve rights: (1) the 2018 Canola Claims arose from the same Wrongful Act as the farmers' 2017 claims and, therefore, the claim predated the Policy; (2) Cibus knew or should have known about the circumstances giving rise to the 2018 Canola Claims; (3) Cibus did not have general liability insurance as required by the Policy; (4) the 2018 Canola Claims arose from breach of warranty so the warranty exclusion applied; (5) the 2018 Canola Claims arose from property damage so the $100,000 Property Damage sublimit applied; and (6) the Wrongful

Act was the defective design of the seeds, which occurred before the Policy's retroactive date.

42. On December 24, 2018, Mr. Halpern disputed the bases for HCC's reservation of rights and provided Mr. McInnis with data regarding the seeds' performance in 2017 in the United States and Canada to show that Cibus did not know, and could not reasonably have known, that a genetic defect in the seeds gave rise to the 2018 Canola Claims.  STIP099.  He also informed Mr. McInnis about Cibus's "GxE" theory of causation for the farmers' poor crop performance in 2018—that environmental conditions impacted the crops' herbicide tolerance during the 2018 growing season.

43. Based on this new information, Ms. Daly, Mr. Minale, and Mr. McInnis discussed the need to retain a seed expert to assist in the technical issues raised by the GxE theory.  Ex. NT.   None of them followed up to retain a seed expert.

44. On December 29, 2018, Mr. McInnis circulated a draft complaint for declaratory relief to Mr. Minale, Ms. Daly, and Ms. Crabtree.  Ex. OG.

45. On December 31, 2018, Mr. Halpern provided Mr. McInnis with the data spreadsheets of farmers in Canada and the United States who planted C5507 and C5522 crops in 2017.  Ex. HD.  The spreadsheets indicated that 53,320 acres of crops performed well in the United States, and 3,800 acres of crops performed poorly in Canada.   STIP102.  Mr. McInnis testified that upon reviewing this data, he understood that environmental conditions affected the crops, which was consistent with the GxE theory of causation—that the same seeds with the same genetic makeup could perform differently from year to year based on environmental conditions.

46. On January 4, 2019, Mr. McInnis offered Cibus $1 million in coverage with no reservations or $2 million under a reservation of rights.  STIP106.  Cibus declined the $1 million settlement offer and chose the $2 million option.

3:19-cv-00828-JO-AGS

47. Mr. McInnis testified that HCC based its decision to maintain its "no coverage" position, pay benefits but only with a reservation of rights, and then file the recoupment action, on the six grounds set forth in the December 21, 2019 reservation of rights letter.

48. In the course of arriving at these coverage positions, Mr. McInnis testified that he exclusively relied on the written farmer claims (Ex. 164); the field summary reports (STIP022); the Cass Report (Ex. 18); the TDS Report (Ex. 28); spreadsheets containing 2017 performance data provided by Mr. Halpern (Exs. HD, 552); the memorandum discussing the contents of the November 29, 2019 meeting with TDS, Cibus, and Mr. Cass (Ex. 553); the underwriting file (Ex. C); instructions from the White Glove Program (Ex. 549); the denial letter from AIIC as to the general liability policy (Ex. 551); Cibus's application for coverage (Ex. B); and various email communications with Cibus (Exs. T, 554, STIP047).

49. HCC made payments totaling the full $2 million in Policy limits to settle the farmers' claims against Cibus. STIP116, 118, 120, 131. The final payment was issued in April 2019.

50. Ms. Daly testified that HCC made its final decision to file the declaratory relief action after it made the final payment in April 2019. She testified that it was ultimately her job to conduct an analysis and to use her independent judgment to reach a conclusion. In doing so, she testified that she relied on the materials provided by Ms. Crabtree and Mr. McInnis, the claim file, the reservation of rights letters, and Mr. McInnis's legal research. Ms. Daly testified that she believed what Mr. McInnis presented to her was reasonable and correct based on the language of the Policy. She further testified that she neither asked for nor thought it was necessary to review any analyses or memoranda providing an objective analysis of the coverage positions.

51. Ms. Daly testified that she and Mr. McInnis made the recommendation to file the declaratory action. She testified that Mr. Minale, who had the final authority to file the action, agreed with and approved the decision.

52. Mr. Minale testified that he relied on Ms. Daly's and Mr. McInnis's recommendation.  Mr. Minale did not mention any further analysis or investigation. Ms. Daly, in turn, relied on Ms. Crabtree's and Mr. McInnis's materials and analyses in deciding to file the declaratory action.

53. Ms. Daly and Mr. Minale testified that it was their job to, and they did in fact, use their independent judgment to come to the determination to file the declaratory and recoupment action.

54. On May 3, 2019, HCC filed the declaratory and recoupment action.

**Legal Standards Regarding Insurer's Duty of Good Faith**

55. Every contract, including an insurance policy, has an implied covenant of good faith and fair dealing "that neither party will do anything which will injure the right of the other to receive the benefits of the agreement." *Amadeo v. Principal Mut. Life Ins. Co.*, 290 F.3d 1152, 1158 (9th Cir. 2002).  In the insurance context, this implied covenant requires the insurer to refrain from injuring its insured's right to receive the benefits of the insurance agreement. *Brehm v. 21st Cent. Ins. Co.*, 166 Cal. App. 4th 1225, 1235 (2008).

56. An insurer breaches the implied covenant of good faith and fair dealing when it delays or denies payment of policy benefits unreasonably or without proper cause. *Jordan v. Allstate Ins. Co.*, 148 Cal. App. 4th 1062, 1072 (2007); *Wilson v. 21st Century Ins. Co.*, 42 Cal. 4th 713, 723 (2007) (finding insurer liable for tortious bad faith if "the insured shows the denial or delay was unreasonable").  Thus, the ultimate test for bad faith is whether the insurer acted unreasonably.  *Guebara v. Allstate Ins. Co.*, 237 F.3d 987, 995 (9th Cir. 2001).

57. While an insurer does not have a fiduciary relationship with a policyholder, the "special" nature of an insurance contract makes the relationship "akin" to a fiduciary one. *Love v. Fire Ins. Exchange*, 221 Cal. App. 3d 1136, 1147 (1990).  Accordingly, the insurer "must give at least as much consideration to the welfare of its insured as it gives to its own interests." *Egan v. Mut. Of Omaha Ins. Co.*, 24 Cal. 3d 809, 818

(1979).  To protect the insured's interests, "it is essential that an insurer fully inquire into possible bases that might support the insured's claim."  *Id.* at 819.  An insurer "cannot reasonably and in good faith deny payments to its insured without thoroughly investigating the foundation for its denial."  *Id.*

58.  Among "the most critical factors" bearing on the insurer's good faith is, therefore, "the adequacy of its investigation of the claim."  *Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc.*, 78 Cal. App. 4th 847, 879 (2000).  The insurer has a duty to investigate a claim thoroughly and "consider, or seek to discover" evidence relevant to the issue of liability and damages under the insurance policy.  *Id.* at 880.  Its "early closure of an investigation and unwillingness to reconsider a denial when presented with evidence of factual errors will fortify a finding of bad faith."  *Id.* at 880; *see also Austero v. Nat'l Cas. Co.*, 84 Cal. App. 3d 1, 35 (1978), rev'd on other grounds in *Egan*, 24 Cal. 3d at 824 (finding good faith where the insurer made "efforts to seek more information from several sources and reconsider plaintiff's claim at various times").

59.  In other words, an insurer has a "duty to diligently search for evidence which supports its insured's claim.  If it seeks to discover only the evidence that defeats the claim, it holds its own interest above that of the insured."  *Mariscal v. Old Republic Life Ins. Co.*, 42 Cal. App. 4th 1617, 1620 (1996).  If an insurer "ignores evidence available to it" which supports coverage or "just focus[es] on those facts which justify denial of the claim," then it acts unreasonably in bad faith.  *Shade Foods*, 78 Cal. App. 4th at 881 (internal quotation omitted); *Amadeo*, 290 F.3d at 1164 (finding an insurer acts unreasonably if it ignores evidence available to it that supports the insured's claim).

60.  Although an insurer is not liable for any denial or delay of policy benefits stemming from a genuine dispute regarding the existence of coverage or the amount of the insured's claim, the existence of a genuine dispute "does not relieve an insurer from its obligation to thoroughly and fairly investigate, process and evaluate the insured's

3:19-cv-00828-JO-AGS

claim." *Wilson*, 42 Cal. 4th at 723.  In other words, a dispute can only be "genuine" after a thorough, fair, and reasonable investigation and evaluation of the insured's claim.

61. In sum, an insurer's "inadequate or tardy investigations, oppressive conduct by claims adjusters seeking to reduce the amounts legitimately payable and numerous other tactics may breach the implied covenant" by frustrating the insured's right to receive the benefits of the contract in compensation for losses. *Waller v. Truck Ins. Exchange, Inc.*, 11 Cal. 4th 1, 36 (1995).

62. A court can consider evidence that an insurer relied on the advice of competent counsel as part of the reasonableness inquiry.[5]  "An insurer may defend itself against allegations of bad faith and malice in claims handling with evidence the insurer relied on the advice of competent counsel." *State Farm Mut. Auto. Ins. Co. v. Super. Ct.*, 228 Cal. App. 3d 721, 725 (1991).  Where an insurer reasonably relied on such advice, even if ultimately the attorney's judgment was mistaken, advice of counsel serves to negate allegations of bad faith. *Id.*; *see also Bohemia, Inc. v. Home Ins. Co.*, 725 F.2d 506, 513 (9th Cir. 1984) (explaining that "when an insurer reasonably relies on a diligent, good faith evaluation by its counsel, the court may treat such reliance as evidence of the insurer's good faith").

63. Reliance on the advice of counsel, however, does not relieve the insurer of its affirmative duties to investigate, evaluate, and adjust the insured's claim. *See, e.g.*, *Blakely v. American Emp. Ins. Co.*, 424 F.2d 728, 734 (5th Cir. 1970) ("We do not hold to the view that an insurer can relieve itself of its duty to investigate, negotiate, settle or defend a claim by showing advice from its investigators, adjusters or legal counsel.").  Moreover, the reliance on the advice of counsel must be reasonable. *See*

---

[5] The Court allows the advice of counsel defense in this case.  After hearing argument and upon review of the parties' submissions, the Court finds that there was no clear waiver of Defendant's advice of counsel defense.  While Plaintiff's litigation conduct did not waive or forego their bad faith claims based on HCC's coverage positions including its decision to pursue a recoupment action, neither did their litigation conduct clearly demonstrate that HCC had waived this defense.

*Allen v. Allstate Ins. Co.*, 656 F.2d 487, 489 (9th Cir. 1981) (permitting jury to conclude that insurer's "reliance on the advice of its attorney was the result of wishful thinking rather than a good faith balancing of its own and its insured's interests" where the attorney asserted that the insurer's case was a "100% winner" despite evidence to the contrary).

64. This advice-of-counsel defense is not a complete bar to bad faith but just one of several "factor[s] to be considered in determining whether an insurance company's denial is reasonable." *Assoc. of Calif. Water Agencies Joint Powers Ins. Auth. v. Transcontinental Ins. Co.*, 92 F.3d 1191 (9th Cir. 1996).

65. Courts have found that reliance on the advice of counsel is a complete bar to a finding of malice, fraud, or oppression to justify an award of punitive damages. *See Fox v. Aced*, 49 Cal. 2d 381, 385 (1957).

**Legal Standards on Policy Interpretation**

66. An insurer has a duty to interpret the insurance policy reasonably. Reasonable interpretation of an insurance contract means "accord[ing] [to] the meaning a layperson would ordinarily attach to it." *Amadeo*, 290 F.3d at 1162. Moreover, an insurer must liberally construe claim forms and the policy in favor of coverage; and exclusions and limitations narrowly against the insurer. *Mariscal*, 42 Cal. App. 4th 1617, 1623 (1996); *Shade Foods, Inc.*, 78 Cal. App. 4th at 881 (finding bad faith denial of coverage where "[i]n light of the insurer's obligation to construe policy provisions broadly in favor of coverage, the policy language presented no serious obstacle to coverage").

67. An insurance company must take a reasonable position under rules of contract interpretation. *Griffin Dewatering Corp.*, 176 Cal. App. 4th at 208 (explaining "if there is an ambiguity in an insurance policy provision, the insurance company must interpret the ambiguity in favor of the policyholder"). An insurer thus has the duty to construe the ambiguous provisions broadly in favor of coverage in order "to protect the 'objectively reasonable expectations of the insured.'" *Amadeo*, 290 F.3d

at 1162 (quoting *AIU Ins. Co. v. Superior Ct.*, 51 Cal. 3d 807 (1990)). This good faith interpretation "emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party." *Neal v. Farmers Ins. Exch.*, 21 Cal. 3d 910, 921 n.5 (1978).

**Legal Standards on Recoverable Bad Faith Damages**

68. As set forth above, when an insurer delays or denies policy benefits in bad faith, the insured can recover attorney's fees reasonably incurred to recover those benefits. *Brandt*, 37 Cal. 3d at 817. Accordingly, if the factfinder determines that the insured is entitled to recover on its bad faith cause of action and that, because of the insured's bad faith, "it was reasonably necessary for the insured to employ the services of an attorney to collect the benefits due under the policy, then and only then is the insured entitled to an award for attorney fees incurred to obtain the policy benefits." *Id.* at 820.

69. In order to recover *Brandt* fees, the insured must prove "(1) the amount to which the insured was entitled to recover under the policy, (2) that the insurer withheld payment unreasonably or without proper cause, (3) the amount that the insured paid or incurred in legal fees and expenses in establishing the insured's right to contract benefits and (4) the reasonableness of the fees and expenses so incurred." *Jordan v. Allstate Ins. Co.*, 148 Cal. App. 4th 1062, 1079 (2007). These recoverable *Brandt* fees include only fees attributable to obtaining the insurance benefits, not "those attributable to the bringing of the bad faith action itself." *Brandt*, 37 Cal. 3d at 815. However, in some cases, "there may be some unavoidable intertwining or overlap of the contract and bad faith issues; in such event, a fair and equitable apportionment" is appropriate. *Jordan*, 148 Cal. App. 4th at 1079.

70. To recover these *Brandt* fees, the insured must separate out its litigation expenses such that it can clearly demarcate the fees attributable to the pursuit of the benefits to which it is entitled under the policy from fees expended on other work. *Slottow v. Am. Cas. Co. of Reading, Penn.*, 10 F.3d 1355, 1362 (9th Cir. 1993) (citing *Brandt*,

37 Cal. 3d at 817). An insured may not be entitled to fees if it makes "no effort to segregate its litigation expenses as required by *Brandt*." *Id.*

71. To properly calculate *Brandt* fees in cases of mixed coverage and bad faith cases, the factfinder must "determine the total number of hours an attorney spent on the case and then determine how many hours were spent working exclusively on the contract recovery. Hours spent working on issues jointly related to both the tort and contract should be apportioned, with some hours assigned to the contract and some to the tort." *Cassim v. Allstate Ins. Co.*, 33 Cal. 4th 780, 811–12 (2004). An insured must prove by a preponderance of evidence both the existence and the amount of damages proximately caused by the insurer's tortious conduct. *Id.* at 813.

72. An insured may also recover punitive damages as a bad faith tort remedy. To recover punitive damages in a bad faith action, a plaintiff must prove by clear and convincing evidence that the defendant is guilty of oppression, malice, or fraud. *Lunsford v. Am. Guar. & Liab. Ins. Co.*, 18 F.3d 653, 656 (9th Cir. 1994) (applying California law); Civil Code § 3294 (a).

73. In a bad faith insurance action, evidence that the insurer acted in bad faith does not alone establish that it acted with the requisite malice to justify an award of punitive damages. *Stewart v. Truck Ins. Exchange*, 17 Cal. App. 4th 468, 483 (1993).

**A. HCC Failed to Fairly and Properly Investigate the Grounds for its Coverage Positions Underlying the Filing of the Declaratory and Recoupment Action**

74. HCC put its interests above those of Cibus by intentionally construing the coverage clauses of the Policy narrowly and the exclusion clauses broadly, thereby rejecting its duty to do the opposite. *Mariscal*, 42 Cal. App. 4th at 1623 (holding that an insurer must liberally construe claim forms and the policy in favor of coverage).

75. For example, HCC unreasonably concluded that the breach of warranty provision applied to exclude coverage by ignoring Policy provisions and facts that favored the insured and failing to fully investigate the bases supporting coverage. *Id.* (an insurer has a "duty to diligently search for evidence which supports its insured's claim").

76. At Ms. Crabtree's instigation, on October 2, 2018, HCC generally reserved its rights on grounds of the breach of warranty exclusion. Ex. DG. The letter stated that "[t]o the extent Cibus made any warranties or guarantees regarding the canola seed, coverage may be limited or precluded by this exclusion. HCC reserves all rights under this provision."

77. On December 21, 2018, HCC first articulated a specific rationale for how the breach of warranty exclusion might preclude coverage based on the TDS Report. The TDS Report concluded that Cibus would likely be liable for breaching statutory implied warranties because it sold farmers low quality seeds. Ex. 28. McInnis characterized the TDS Report as "focus[ing] exclusively on Cibus's potential liability for breach of warranty" and asserted that the Policy's exclusion could apply given that "Cibus's liability appears to arise out of breach of warranty[.]" STIP096. At trial, Ms. Crabtree confirmed that she concluded the breach of warranty exclusion precluded coverage for this same reason.[6]

78. In doing so, the Court finds as a matter of fact that HCC unreasonably ignored Policy language that supported coverage. The Policy explicitly provides that the warranty must be "made by the Insured" in order for the exclusion to apply. However, neither Ms. Crabtree nor Mr. McInnis considered or analyzed the import of this language before concluding that a breach of implied warranties—the act of selling goods that do not meet a certain standard—triggered this exclusion. Neither Ms. Crabtree nor Mr. McInnis considered, researched, or analyzed, whether this

---

[6] Mr. McInnis testified that he had an additional reason for believing that the breach of warranty exclusion applied. He explained that the November 29, 2018 meeting memorandum noted that Cibus marketed the seeds as "being compatible with Rotam Draft herbicide." Ex. 553. He testified that he "believed" Cibus's promotional marketing statements were express warranties made by Cibus. Even if HCC based their coverage position on the ground that Cibus had made express warranties, Mr. McInnis and HCC unreasonably failed to consider or investigate the possibility that Cibus's breach of implied warranty was an alternate ground for liability such that the express warranty exclusion would not apply.

3:19-cv-00828-JO-AGS

language meant that only express warranties *made by* Cibus—as opposed to *implied* warranties created by statute—would trigger a coverage exception.  Nor did they consider how a layperson would have interpreted an exclusion limited to warranties "made by the Insured"—whether this language would have created reasonable expectations that the insured would be covered so long as it did not make express warranties guaranteeing the product.  *Amadeo*, 290 F.3d at 1162.

79. Further, Mr. McInnis and Ms. Crabtree also ignored clear Policy language that the breach of warranty exclusion does not apply if Cibus could be liable "even in the absence of such warranty or guaranty"—that is, if alternate grounds for liability exist.  No evidence or credible testimony shows that Mr. McInnis or Ms. Crabtree considered whether Cibus would be liable on grounds other than breach of warranty. HCC failed to engage in this inquiry despite the fact that the TDS Report, which it relied on in other respects, clearly noted that Cibus could be liable on negligence grounds, apart from breach of implied warranty grounds.  *See* TDS Report.  Both Mr. McInnis and Ms. Crabtree focused on the portions of the TDS Report that they believed excluded coverage (that Cibus was liable for breach of implied warranty) and ignored the portions that would support coverage (that Cibus was also liable for negligence).  Consequently, they again failed to investigate a basis that would support coverage: the possibility that the warranty exclusion would not apply because Cibus could be liable on alternate grounds.

80. Third, in making its coverage determinations, HCC also ignored factual information that supported coverage.  Neither Ms. Crabtree nor Mr. McInnis considered whether the express disclaimers of warranty Cibus attached to each bag of seed it sold impacted the applicability of the warranty exclusion, despite having this relevant information in Cibus's claims file.

81. In failing to consider the above, the Court finds that HCC unreasonably failed to inquire into grounds that may support coverage, as good faith required it to do.  The Court finds that no credible evidence in the record indicates that Mr. McInnis

analyzed how the above Policy language limiting the applicability of the breach of warranty exclusion or the effect of the express disclaimer of warranties might support coverage.  Nor is there credible evidence that anyone at HCC asked for such an analysis.  Further, Ms. Crabtree is an experienced claims adjuster with a legal background and testified that it was her job to determine whether coverage applied based on the language of the Policy.  Thus, she should have been aware of this relevant Policy language and requested an analysis that accounted for, rather than ignored, this language and the facts that might support coverage.

82. Ms. Daly and Mr. Minale, upon receiving the materials from Mr. McInnis and Ms. Crabtree, similarly failed to ensure that their analysis of the breach of warranty exclusion, (1) included all relevant Policy language and facts bearing on coverage, and (2) comported with an insurer's duty to construe exclusions narrowly and coverage broadly.  The Court concludes that Mr. McInnis provided a patently incomplete and one-sided analysis that failed to consider the relevant Policy language and pertinent facts.  HCC then unreasonably relied on Mr. McInnis's flawed analysis to claim that the breach of warranty exclusion precluded coverage and to ultimately file a recoupment action on this ground.  By relying solely on this patently incomplete analysis, the Court finds that HCC failed to adequately evaluate and investigate Cibus's claim for coverage and unreasonably relied on counsel. *Blakely*, 424 F.2d at 734 (holding that reliance on advice of counsel does not relieve the insurer's affirmative duties to investigate and evaluate the insured's claim).  HCC did not simply make a mistake or exercise poor judgment after diligently analyzing and investigating all grounds that support coverage; it acted unreasonably and in bad faith by only seeing what it wanted to see and ignoring the rest.

**B. HCC Unreasonably Interpreted the Policy to Preclude Coverage in Situations Where Coverage Would be Reasonably Expected**

83. In an effort to avoid coverage or reduce the amounts payable under the Policy, the Court finds that HCC also unreasonably interpreted the Policy to preclude coverage

in situations where the insured would reasonably expect it.  *Amadeo*, 290 F.3d at 1162 (holding an insurer has the duty to interpret policy so it "protect[s] the objectively reasonable expectations of the insured").

84. For example, in concluding that the Property Damage sublimit would cap Cibus's coverage at $100,000, HCC intentionally failed to consider Cibus's reasonable coverage expectations under an errors and omissions policy for its professional services as a seedsman.

85. The Policy Cibus purchased from HCC was a professional liability policy for its services as a seedsman, *i.e.*, someone engaged in the business of selling seeds to farmers who grow and sell crops.  From the evidence presented during both phases of the trial, the Court finds that Cibus purchased this Policy expecting it to cover farmers' claims of economic loss stemming from the failure of the company's seeds.  As the insurance broker explained to Ms. Crabtree, the purpose of an errors and omissions insurance policy is to cover the failure of the product to perform and the economic losses resulting from that diminished yield.  The Court concludes from the testimony and the evidence in the record from both Phase I and Phase II that Cibus's expectation was reasonable given that the central professional service performed by a seedsman is selling seeds.

86. HCC unreasonably failed to consider these reasonable coverage expectations in advancing and persisting in its position that the Property Damage sublimit of $100,000 potentially applied to the farmers' claims against Cibus.

87. On July 24, 2018, HCC retained Mr. McInnis as coverage counsel because it believed the Property Damage sublimit potentially applied.  On September 5, 2018, Ms. Crabtree asserted her position that the Property Damage sublimit potentially applied to Cibus's claim.  At trial, she testified that she based this conclusion on Mr. Kolida's August 20, 2018 email stating that his "canola was clearly damaged."  She also relied on certain field summary reports received in August 2018 that noted the farmers' crops had "damage."  On October 2, 2018, in a letter penned by Mr.

McInnis, HCC asserted a reservation of rights on grounds that the Property Damage sublimit applied to the claim.  Like Ms. Crabtree, Mr. McInnis testified that he relied on Mr. Kolida's email and the field summary reports noting "damage" to the crops in concluding that the Property Damage sublimit applied.

88. The Court finds that Ms. Crabtree and Mr. McInnis merely latched on to the word "damage" and the farmers' descriptions of crop damage to conclude that the Property Damage sublimit applied.  In addition, Mr. McInnis appears to have found some cases that supported his position; typical of how he handled all the coverage analysis in this matter, however, there is no evidence that he located or analyzed the cases that might support coverage.

89. Further, no evidence or credible testimony shows that either Ms. Crabtree or Mr. McInnis considered or analyzed whether this application of the Property Damage sublimit would defy the reasonable expectations of an insured who purchased an insurance policy of this kind.  *Neal*, 21 Cal. 3d at 921 n.5 (insurer has duty to construe policy broadly and consistent with the insured's reasonable expectations). While Mr. Kolida and some other farmers described the physical condition of the canola leaves, their essential complaint was the failure and low yield of their crops. Mr. McInnis and Ms. Crabtree ignored the actual language of the farmer's claim forms that clearly stated they were seeking compensation for economic loss from "substantial yield loss" and "loss of revenue per acre." Ex. DC.  For a seedman who purchased a $2 million professional services liability policy to cover exactly this eventuality, the insurer's position that a $100,000 Property Damage sublimit applied simply because the farmers' crops showed damage before they failed to produce yield belies reasonable expectations.  Instead of considering Cibus's reasonable expectations of coverage, *see Neal*, 21 Cal. 3d at 921 n.5, HCC ignored them altogether and persisted in an interpretation that unreasonably placed its interests above those of Cibus.  *Mariscal*, 42 Cal. App. 4th at 1620 (insurer cannot "hold its own interest above that of the insured.").

27

90. Nor does the record show that HCC reasonably relied on counsel's advice regarding the Property Damage sublimit.  Mr. Minale and Ms. Daly testified that they reached their coverage positions based on the conclusions of Mr. McInnis and Ms. Crabtree and reserved rights on those grounds because they worked with Mr. McInnis and Ms. Crabtree previously.  No record evidence or credible testimony shows that Mr. Minale or Ms. Daly requested an analysis of the Property Damage sublimit from Mr. McInnis or considered whether applying the sublimit would protect the insured's reasonable expectations of the Policy's protections.  The Court finds as a matter of fact that HCC unreasonably relied on counsel's analysis that omitted crucial considerations such as the reasonable expectations of the insured and that, when faced with an inadequate and incomplete analysis, HCC failed to request further information.  *Blakely*, 424 F.2d at 734.  In doing so, HCC unreasonably failed to adequately and in good faith analyze and investigate Cibus's claims.

## C.  HCC Acted Unreasonably by Failing in its Basic Duty to Analyze Significant Terms of the Policy Upon Which Coverage Hinged

91. The Court finds as a matter of fact that HCC conducted no analysis on the meaning of "Wrongful Act" within the meaning of the Policy, even though its position on coverage, reservation of rights, declaratory relief, and recoupment hinged on its interpretation.

92. Ms. Crabtree and others at HCC had the duty to interpret the Policy language, including terms like "Wrongful Act."  Ms. Crabtree testified that she had the duty as the claims adjuster to interpret the Policy and determine whether coverage existed based on the circumstances.  Ms. Daly also testified that Ms. Crabtree and her supervisors, with the help of outside counsel, had the duty to determine the meaning of the Policy's terms.  Furthermore, HCC had the obligation, as the insurer, to liberally construe claim forms and the Policy in favor of coverage, *Mariscal*, 42 Cal. App. 4th at 1623, and to fully inquire into bases that support coverage, *Egan*, 24 Cal. 3d at 818.

28

93. Without any consideration or analysis of the Policy language and how its language applied to the circumstances at hand, HCC took the position that the "Wrongful Act" under the Policy was the defective design of the C5522 and C5507 seeds in 2015.

94. The Policy provides that HCC "shall pay Loss and Claim expenses . . . that an Insured shall become legally obligated to pay as a result of a Claim made against an Insured for a Wrongful Act arising from Professional Services."  The Wrongful Act, in turn, is defined as "any actual or alleged negligent act, error or omission committed or allegedly committed by any Insured solely in connection with the rendering of Professional Services."  Pursuant to the plain language of the Policy, the Wrongful Act is therefore the actual or alleged "negligent act, error, or omission" that forms the basis of the farmers' claims against Cibus.

95. HCC demanded that Cibus provide written claim forms from the farmers who suffered crop injury in 2018, both to comply with the Policy's "Claim" requirement, and so that HCC could determine the "Wrongful Act" underlying the farmers' claims.

96. Each one of the farmers' written claims for the 2018 Canola Claims alleged that they suffered low crop yield and revenue loss in 2018 from the seeds they purchased from Cibus.  The TDS Firm, tasked with analyzing Cibus's liability for the 2018 Canola Claims, described them as "claims being advanced with respect to the sale of allegedly defective canola seed during the 2018 farming season."  Ex. 28.

97. After HCC received notice of these farmers' written claims on August 18, 2018, however, it did not consider or analyze their allegations to determine what the Wrongful Act was.  Instead, as of October 2, 2018, HCC persisted in its position via Mr. McInnis that it still lacked information on what constituted the Wrongful Act.

98. In December 2018, Mr. Cass and the TDS Firm provided HCC with their respective reports.  Exs. 18, 28.  Mr. Cass's Report concluded that the root cause of the 2018 crop failures was the insufficient tolerance of the seed based on its genetic makeup.  The TDS Report concluded that HCC should settle the 2018 Canola Claims because

1     Cibus would be liable for a breach of implied warranty; in other words, it found that

2     Cibus would be liable for *selling* a non-performing product.

99. Mr. McInnis testified that, based on the conclusions in the above reports, he also concluded that the root cause of the 2018 crop failures was insufficient herbicide tolerance from poor genetic design.  Then, without conducting any further analysis of the Policy language surrounding "Wrongful Act," the reasonable expectations of the coverage created by the language, or any other rational grounds, Mr. McInnis jumped to the conclusion that the "Wrongful Act" within the meaning of the Policy meant the root cause of the 2018 crop failures.

100. The record does not show that either Mr. Cass or the TDS Firm had insurance policy interpretation experience or were tasked with a duty to interpret the term "Wrongful Act" in the Policy.  Nevertheless, Mr. McInnis testified that he based his interpretation of the Wrongful Act on their conclusions.

101. In doing so, HCC acted unreasonably by failing to carry out its basic duty as the insurer to interpret the Policy and to reasonably construe ambiguous language broadly, so it affords coverage to its insured.  *Griffin Dewatering Corp.*, 176 Cal. App. 4th at 208.  Neither Ms. Crabtree nor Mr. McInnis considered whether the "Wrongful Act" alleged by the farmers in the 2018 Canola Claims was Cibus's sale of defective seeds in 2018 for the growing season—not its original design years earlier.  This interpretation of "Wrongful Act" is supported by the Policy language and by the substance of the farmers' claims complaining of low yield and profit loss from the seeds they purchased—indeed, this Court found that it is the correct interpretation.  The TDS Report issued to HCC offering an opinion on Cibus's liability for the 2018 Canola Claims even summed up the claims as those "being advanced with respect to the sale of allegedly defective seeds during the 2018 farming season."  By failing to even consider this alternate interpretation, HCC failed to discharge its good faith duty to fully inquire into bases that support coverage.  *Egan*, 24 Cal. 3d at 819.  While good faith does not require that an insurer

make no mistakes, it does require the insurer to reasonably and fairly investigate the bases for its coverage positions. *See Shade Foods, Inc.*, 78 Cal. App. 4th at 880. The Court finds that HCC unreasonably failed to do so.

102. Despite the absence of support for its conflation of the Wrongful Act and the scientific root cause of the crop failures, HCC then took the position that no coverage existed under the Policy because the purported Wrongful Act—the defective design of the seed—occurred in 2015 before the Policy period.  HCC further took the position that coverage was precluded because the crop failures in 2017 and 2018 were caused by the same seed defect, meaning that Cibus's first claim actually occurred in 2017 prior to the inception of the Policy Period.

103. The Court finds as a matter of fact that HCC's reliance on Ms. Crabtree's and Mr. McInnis's interpretation of the term "Wrongful Act" was unreasonable.  Despite their independent duty to do so, Ms. Daly and Mr. Minale did not use their judgment to interpret the Policy language.  Nor did they question the lack of reasoning or any articulated basis behind Ms. Crabtree's and Mr. McInnis's interpretation of "Wrongful Act."  Ms. Daly and Mr. Minale also failed to ask for any analysis of the Policy's language or whether there were other reasonable interpretations that could support coverage.  The Court finds as a matter of fact that Ms. Daly and Mr. Minale merely accepted Mr. McInnis's and Ms. Crabtree's conclusions, and that this reliance was unreasonable in light of the absence of analysis, memoranda, or other efforts to ensure good faith evaluation of this coverage issue.  *Blakely*, 424 F.2d at 734 (holding that reliance on advice of counsel does not relieve the insurer's affirmative duties to investigate and evaluate the insured's claim).

## D. HCC's Biased Investigation Failed to Consider Evidence that Supported Coverage

104. The Court finds as a matter of fact that during the claims handling process, HCC conducted a biased and one-sided investigation into Cibus's claim by failing to consider the extensive evidence that supported coverage. *Shade Foods*, 78 Cal. 4th at 881; *Amadeo*, 290 F.3d at 1164.

31

105. For example, the Court finds that HCC intentionally ignored portions of the Cass Report that supported coverage when it concluded that Cibus reasonably should have known about the circumstances giving rise to the 2018 Canola Claims and denied coverage on those grounds.

106. Mr. McInnis testified that he relied on the Cass Report for his position that Cibus knew or should have known about the 2018 Canola Claims because the Cass Report discussed farmer complaints made in 2017 arising from seeds with the same genetics.  The Cass Report, however, indicated that in 2017, Cibus understood the crop problems experienced in Canada to have arisen from improper herbicide application practices.  In accordance with this understanding, Cibus implemented a White Glove Program to remedy the herbicide application issues and prevent them from occurring again in the 2018 growing season.  Thus, the Cass Report provided support for the proposition that Cibus did not know in 2017 that seed failure—once improper herbicide application issues were addressed—would occur in 2018.

107. While the Cass Report did discuss that genetic herbicide intolerance was the root cause of the 2018 claims, the Cass Report further stated that this determination was made in the summer of 2018 based on 2018 testing comparing the performance of seeds with two herbicide tolerance genes to seeds with only one gene.

108. The above information from the Cass Report supported the conclusion that Cibus could not reasonably have known in 2017 that the 2018 Canola Claims would occur. But Ms. Crabtree and Mr. McInnis reached the opposite conclusion by intentionally ignoring the information in the Cass Report that supported coverage and solely "focus[ing] on those facts which justify denial of the claim." *Mariscal*, 42 Cal. App. 4th at 1623; *Amadeo*, 290 F.3d at 1164 (finding an insurer acts unreasonably if it ignores evidence available to it that supports the insured's claim).

109. HCC focused only on the portion of the Cass Report (and the TDS Report reiterating the Cass Report's findings) stating that, in 2018, the crop failures were caused by the genetic design of the C5507 and C5522 seeds causing insufficient herbicide

tolerance.  From this information, Ms. Crabtree and Mr. McInnis decided to draw an unsupported inference:  Because Mr. Cass came to this conclusion in 2018, Cibus should have known in 2017 that the crop failures in 2018 would occur.  In doing so, HCC not only ignored AgCall's conclusion that the 2017 crop injuries resulted from improper herbicide application practices but also failed in its good faith duty to investigate this information in forming its coverage decision.  *Shade Foods, Inc.*, 78 Cal. App. 4th at 879–80 (insurer has a duty to investigate a claim thoroughly and "consider, or seek to discover" evidence relevant to the issue of liability and damages under the insurance policy).

110. HCC also unreasonably concluded that there were 2017 Claims arising from the same Wrongful Act—the defective design of the seeds—such that the first "claim" was in 2017 and predated the Policy period.  Mr. McInnis testified that he relied on the Cass Report for his position that coverage was precluded on this ground.  The Cass Report, however, makes no mention of any claims in 2017, let alone complaints, that would trigger this Policy limitation.  The Court finds that HCC also failed to gather evidence relevant to whether the farmers negative experiences in 2017 resulted in any written claims that would trigger the above Policy limitation.  The Court finds that in failing to do so, HCC intentionally chose not to seek information that could have shed light on whether the crop issues in 2017 gave rise to a "Claim" within the meaning of the Policy.  Further, no credible evidence establishes that Mr. McInnis or Ms. Crabtree considered the absence of claims in 2017 before concluding that this ground precluded coverage—illustrating another instance of HCC failing to reasonably investigate and analyze grounds supporting coverage.

111. Upon receiving Mr. McInnis's recommendation to reserve rights on the above grounds, HCC unreasonably failed to question whether, or ensure that, this analysis was complete—that is, based on the investigation and consideration of evidence supporting coverage as well as evidence supporting denial.  Nor did HCC request

33

such an analysis before relying on Mr. McInnis's conclusion.  HCC's reliance on counsel's conclusions in this regard was unreasonable in the absence of any adequate investigation into, and consideration of, the relevant information.  *Blakely*, 424 F.2d at 734.

**E. HCC Unreasonably Turned a Blind Eye and Failed to Seek Relevant Evidence on Coverage**

112. The Court finds that HCC also failed to request evidence to support all sides of the coverage dispute prior to filing the declaratory and recoupment action.  According to Ms. Daly, she failed to request, and she did not receive, information from outside coverage counsel that analyzed the strengths and weaknesses of HCC's coverage positions, nor did she believe it was necessary to do so.  Ms. Daly only reviewed the one-sided reservation of rights letters and materials provided by Mr. McInnis and Ms. Crabtree.  Mr. Minale also failed to request a balanced and fair analysis on the information that potentially supported coverage.  No one at HCC asked Mr. McInnis to create an objective memorandum analyzing the strengths and weaknesses of the coverage positions.

113. The Court finds that, by failing to seek a balanced coverage opinion from coverage counsel prior to filing the declaratory and recoupment action, HCC unreasonably chose to only review one-sided evidence that supported denying coverage.  HCC therefore sought to "discover only the evidence that defeats the claim, [therefore] hold[ing] its own interest above that of the insured."  *Mariscal*, 42 Cal. App. 4th at 1620 (insurer has duty to "diligently search for evidence which supports its insured's claim"); *Egan*, 24 Cal. 3d at 819 ("it is essential that an insurer fully inquire into possible bases that might support the insured's claim.").

114. The Court concludes that HCC unreasonably made the decision to file the declaratory and recoupment action without requesting objective evidence on both sides of the coverage dispute or seeking additional evidence for clarity on its

positions, despite its duty to properly consider all evidence to support or deny coverage.

115. As a further example, HCC also unreasonably failed to gather evidence that would potentially support coverage and undercut its own position of "no coverage" before taking the position that Cibus's failure to retain general liability insurance under the policy precluded coverage. Even after the insurance broker gave HCC notice that Cibus had such a policy, HCC failed to follow up. Mr. McInnis testified that the insurance broker referenced a Chubb general liability policy to Ms. Crabtree when the claim was first tendered to HCC. He testified that after the Chubb policy was mentioned to Ms. Crabtree, there was no further mention or follow up on the general liability policy, which was a precondition to coverage under the Policy.

116. HCC did not formally follow up on the general liability policy until after Mr. Halpern provided Mr. McInnis with a copy of a policy issued by AIIC and a letter from AIIC denying coverage.

117. Ms. Crabtree testified that she did not review a general liability policy or the AIIC denial letter prior to forming her conclusion in December 2018 that the general liability requirement precluded coverage under the Policy. No record evidence or credible testimony shows that, prior to taking this position in the reservation of rights letter on December 21, 2018, either Ms. Crabtree or Mr. McInnis followed up on the general liability policy the insurance broker told them about or investigated whether Cibus had satisfied the Policy's general liability insurance requirement.

**F. HCC Failed to Reconsider its Coverage Positions in Light of New Evidence that Supported Coverage and Persisted in its Decision to File the Declaratory Relief and Recoupment Action**

118. The Court finds as a matter of fact that HCC unreasonably failed to consider new evidence and reevaluate its coverage positions in good faith before filing the declaratory relief and recoupment action. *Shade Foods, Inc.*, 78 Cal. App. 4th at 879–80 (finding bad faith from the insurer's "early closure of an investigation and

1    unwillingness to reconsider a denial when presented with evidence of factual
2    errors").

3    119. For example, Mr. McInnis failed to properly consider or investigate how new
4         evidence impacted HCC's positions on coverage and the propriety of a declaratory
5         and recoupment action.  On December 21, 2018, HCC made the decision to pay the
6         full $2 million policy limit to settle the 2018 Canola Claims but reserved its rights
7         to dispute coverage and seek full recoupment.  After HCC reserved its rights, Mr.
8         Halpern provided Mr. McInnis with spreadsheets of data regarding the farmers'
9         experiences with Cibus's seeds in 2017.  This data indicated that, in 2017, the seeds
10        performed well in almost all of the acreage planted and only performed poorly on
11        certain Canadian farms, supporting the conclusion that Cibus did not have reason to
12        believe the 2018 Canola Claims would occur.  Mr. Halpern also informed Mr.
13        McInnis about the "GxE" theory of causation, which also supported the conclusion
14        that Cibus did not have reason to believe the 2018 Canola Claims would occur.

15   120. Mr. McInnis testified that he believed the GxE theory of causation was "viable," and
16        that the data described above was consistent with this theory.  Ex. MM.  Despite this
17        belief, Mr. McInnis did not follow up to investigate the GxE theory, which directly
18        impacted HCC's coverage positions.  Instead, on December 29, 2018, Mr. McInnis
19        circulated a draft of the declaratory relief complaint to Mr. Minale, Ms. Daly, and
20        Ms. Crabtree.

21   121. Two days later, Mr. McInnis received additional spreadsheets from Mr. Halpern
22        reflecting crop data that further supported the GxE theory of causation.  Mr. McInnis
23        testified that upon reviewing this data, he understood that environmental conditions
24        affected the crops, which was consistent with the GxE theory of causation.  Despite
25        this understanding, Mr. McInnis again failed to fairly investigate and consider this
26        new evidence that supported coverage.

27   122. In doing so, the Court finds as a matter of fact that HCC breached its duty to
28        thoroughly consider new evidence before maintaining its coverage positions and

filing the action for declaratory relief and recoupment. *Austero*, 84 Cal. App. 3d at 35 (good faith involves insurer's "efforts to seek more information from several sources and reconsider plaintiff's claim at various times").

123. Ms. Daly and Mr. Minale also failed to fairly reconsider their coverage positions in light of this new evidence. They testified that they chose not to retain an expert to investigate the 2017 performance data and GxE theory prior to filing the declaratory action. Despite being faced with new evidence that supported coverage, HCC unreasonably failed to thoroughly investigate and pursue these new grounds that potentially supported coverage and militated against filing the declaratory and recoupment action. Nor did Ms. Daly or Mr. Minale, who each adjusted professional liability claims for years, request an analysis of coverage positions based on the new evidence. The Court finds as a matter of fact that HCC unreasonably relied on counsel because it did not consider or request an analysis of the coverage positions in light of this new evidence.

**Cibus Suffered Harm from HCC's Bad Faith in the Form of Attorney's Fees**

124. As set forth above, the Court finds that HCC's unreasonable coverage positions and decision to file the declaratory relief and recoupment action harmed Cibus by forcing it to spend attorney's fees to defend against HCC's recoupment action.

125. Cibus hired Mr. Halpern's law firm as outside counsel for both the coverage and bad faith phases of this action. To demonstrate the *Brandt* fees that it incurred to litigate coverage issues, Cibus presented the testimony of Mr. Halpern and introduced into evidence a compilation of its billing records and its monthly attorney's fees invoices. Exs. JU-LR.

126. Mr. Halpern testified that his team billed time for both coverage and bad faith issues. In preparing to seek *Brandt* fees for coverage-related litigation, he instructed his team members to use their best judgment to deduct the time billed to bad faith issues only. They did so by redacting bad-faith only billing from the monthly invoice and subtracting the amount. Exs. JU-LR; JT.

127. Mr. Halpern testified that his firm engages in block billing, which means that the attorney aggregates multiple tasks into a single entry without providing specific detail as to the amounts of time performed for each task in the entry. Instead, a single time value is assigned to the entire entry, which means that the total time charged equates to the sum of all the tasks in the entry. Mr. Halpern testified that for block entries containing tasks billed for both contract and tort issues, his firm would sometimes deduct the time for the entire entry to err on the conservative side. The billing records reflect this practice. *See* Exs. KN, KJ.

128. Mr. Halpern testified that if the total time billed for a mix of coverage and bad faith issues would have been billed anyway for just the coverage issues, then his team allocated the full time for *Brandt* fees. For example, Mr. Halpern took a deposition of Ms. Crabtree on September 15, 2020, and billed eight hours for the task. Ex. KR. He apportioned the entire eight hours to *Brandt* fees. He testified that although the deposition concerned issues regarding both coverage and bad faith, he allocated the entire time for the deposition to the *Brandt* fees because those eight hours would have been billed for just coverage issues regardless.

129. According to the billing summary, Cibus paid Mr. Halpern's firm attorney's fees incurred for Phase I coverage issues in the total amount of $2,345,313.35. The first bill date was around November 2018 and the last bill date was November 2022.

130. Upon examination of the underlying billing records submitted by Cibus, the Court finds that, although Cibus reasonably deducted time billed solely on the bad faith issue, it has failed to apportion time billed jointly on both coverage and bad faith issues. For example, as explained by Mr. Halpern, where time was spent on depositions for both coverage and bad faith issues, his team made no effort to apportion that time and instead billed it all to coverage issues. Ex. KR. Cibus also failed to apportion the amount of time billed on scheduling orders, case management, early neutral evaluations, and protective orders that reasonably involved both coverage and bad faith phases of the case. Exs. KG, KH.

3:19-cv-00828-JO-AGS

131. The California Supreme Court in *Cassim* was clear that "if an attorney spends time in pursuit of both contract and extracontractual claims simultaneously, plaintiff should be entitled to a portion of any nonsegregated fees and costs for pursing these joint claims." 33 Cal. 4th 780, 811.  The court instructed, therefore, that "to the extent some overlap in legal work occurs, the trial court should exercise its discretion to apportion the fees." *Id.*

132. Because Cibus failed to apportion the attorney hours spent jointly on coverage and non-coverage issues, the Court finds that it has not met its burden to "demonstrat[e] how the fees for legal work attributable to both the contract and the tort recoveries should be apportioned." *Cassim*, 33 Cal. 4th at 813; *Slottow v. American Cas. Co.*, 10 F.3d 1355, 1362 (plaintiff bears the burden to show how *Brandt* fees should be apportioned).  The Court therefore exercises its discretion to "apportion[] the legal fees to ensure that the *Brandt* fee award reflects only those fees 'attributable to the attorney's efforts to obtain'" benefits under the policy.  *Cassim*, 33 Cal. 4th at 813 (quoting *Brandt*, 37 Cal. 3d at 819).

133. Given that Plaintiff's requested amount represents fees incurred in litigating coverage but may also be attributable to bad faith, the Court finds that it is appropriate to award 50% of the $2,345,313.  The Court is faced with a situation where, although Plaintiff has deducted time spent litigating solely the bad faith issue, Plaintiff has not identified (1) which tasks are related solely to the coverage issue, and (2) which tasks are related to both bad faith and coverage and thus, are subject to apportionment under *Cassim*.  Because Plaintiff has not submitted this evidence, the Court cannot discern which time entries go to coverage alone and which go to both coverage and bad faith.  Coverage and bad faith issues were intertwined for much of this action—for example, even the Phase I coverage trial included factual issues and argument that also went to bad faith.  Moreover, the block-billed invoices and the descriptions provided do not provide sufficient information for the Court to attempt to segregate the entries.  For the above reasons, the Court finds that the only

3:19-cv-00828-JO-AGS

apportionment supported by a preponderance of the evidence is one that is right down the middle; it does not have sufficient evidence to attempt any other apportionment. Accordingly, the Court finds that Cibus has proved, by a preponderance of the evidence, that it incurred $1,172,656.68 in legal fees and that these fees proximately resulted from HCC's bad faith persistence in its coverage positions and its initiation of the declaratory relief and recoupment action.

134. With regard to punitive damages, the Court finds that Cibus has failed to set forth clear and convincing evidence that HCC acted with oppression, malice, or fraud to warrant punitive damages. *State Farm Mut. Auto. Ins. Co.*, 228 Cal. App. 3d at 725. The Court finds that, while the evidence shows that HCC unreasonably handled Cibus's claim, its behavior does not rise to the level of oppression, malice, or fraud such that punitive damages are available. *Stewart*, 17 Cal. App. 4th at 483 (defining malice and oppression as the "intent to injure" the insured or "despicable conduct carried out in conscious disregard of [the insured's] rights"); *Tomaselli v. Transamerica Ins. Co.*, 25 Cal. App. 4th 1269, 1287 ("[t]he mere carelessness or ignorance of the defendant does not justify the imposition of punitive damages.").

135. For the reasons stated above, the Court grants judgment in favor of Cibus on its bad faith claim and its claim for breach of contract. The Court finds that Cibus is entitled to damages in the form of *Brandt* fees in the amount of $1,172,656.68.

**IT IS SO ORDERED**.

Dated:  August 23, 2023

Hon. Jinsook Ohta
United States District Judge